# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| TODD MOSCOWITZ, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 2019-0780-MTZ |
| | ) | |
| THEORY ENTERTAINMENT LLC, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

Date Submitted: July 15, 2020
Date Decided: October 28, 2020

Stephen B. Brauerman, BAYARD, P.A., Wilmington, Delaware; Stanton L. Stein and Ashley R. Yeargan, RUSS, AUGUST & KABAT, Los Angeles, California, *Attorneys for Plaintiff.*

Kevin G. Abrams, Michael A. Barlow, and Joseph A. Sparco, ABRAMS & BAYLISS LLP, Wilmington, Delaware; Scott A. Edelman and Ilissa Samplin, GIBSON, DUNN & CRUTCHER LLP, Los Angeles, California, *Attorneys for Defendant.*

**ZURN, Vice Chancellor.**

This is a case of contractor's remorse. The plaintiff is a former attorney and sophisticated businessman who has enjoyed great success in the music industry. The defendant company, a Delaware limited liability company, is a music label cofounded by the plaintiff. As a founding member of the company, the plaintiff received 25% ownership in the form of common and preferred units in exchange for his initial investment.

When new members invested in the company, the company and its members entered into a series of three agreements that bind the plaintiff. These agreements complement each other, as each one foreshadows the more restrictive terms of the next. The company's members executed the first agreement in the series, an operating agreement naming the plaintiff as a co-manager. The operating agreement also permitted issuance of new incentive units, subject to the terms set forth in the issuance plan attached to and incorporated into the operating agreement. The second agreement in the series, the issuance plan, empowered the manager to grant those incentive units to management in the manager's sole discretion. The plan mandated that any issuance would not issue or vest until the recipient executed a forthcoming award agreement and tax election. The plan foreshadowed that such an award agreement would impose terms and conditions on the award, including those related to unit forfeiture, unit repurchase, and the unitholder's termination, as the manager deemed appropriate. The award agreement was the final document in the series.

The new members diluted the plaintiff's interest to 11.9%, and all agreed that he should maintain a 12% stake in the company to avoid an immediate tax event. The company and plaintiff agreed he would receive incentive units pursuant to the plan equal to 0.1% of the company's equity. He executed an award agreement and tax election as required by the plan, both of which acknowledged that the incentive units issued and became effective upon execution.

The plaintiff's award agreement permitted the company to repurchase all of the plaintiff's units—not only incentive units, but also common and preferred—upon his departure from the company. If the plaintiff separated from the company under circumstances considered "for cause" or a "forfeiture termination," the company could repurchase the plaintiff's entire equity stake for as little as $0.10 per unit. If the plaintiff left the company on more favorable terms, the company could repurchase his equity for fair market value. The plain terms of the award agreement put the plaintiff on notice that his total equity might be cashed out, at the company's discretion, when he left. He signed the award agreement and agreed to these terms, despite doing so in exchange for a perceivably small stake of 0.1%.

Thereafter, the plaintiff submitted a resignation letter that stated his resignation was effective immediately. Such resignation, without advance written notice, triggers a "for cause" or "forfeiture termination" under the award agreement. The plaintiff drafted his resignation letter to be conditioned on retaining his equity

2

in the company, overriding the award agreement's terms. The company held fast to the agreement and sought to purchase the plaintiff's total equity at $0.10 per unit. The plaintiff then attempted to rescind his resignation and resubmit it on terms that he believed would avoid the company's repurchase right. The company pressed its repurchase right, and this action followed.

The plaintiff presents a number of claims challenging the company's repurchase and seeking to validate his attempted conditional resignation. The company moved to dismiss on the grounds that the terms of the agreements both authorize its conduct and foreclose plaintiff's conditional resignation. To the extent the plaintiff's claims question the company's rights under the agreements, the motion is granted. Unfortunately for the plaintiff, "Delaware is more contractarian than many other states," recognizing "that parties have a right to enter into good and bad contracts, the law enforces both."[1] Delaware law presumes the plaintiff is bound by the language of the agreements he signed, no matter how draconian. It affords no occasion to weigh the sufficiency of the consideration the plaintiff received (0.1% equity) against the company's rights to repurchase all of his equity, or the consequences of the plaintiff's resignation without written notice. The agreements

---

[1] *HC Cos., Inc. v. Myers Indus., Inc.*, 2017 WL 6016573, at *5 (Del. Ch. Dec. 5, 2017) (alteration, internal quotation marks, and omission omitted) (quoting *GRT, Inc. v. Marathon GTF Tech., Ltd.*, 2011 WL 2682898, at *12 (Del. Ch. July 11, 2011), and then quoting *Nemec v. Shrader*, 991 A.2d 1120, 1126 (Del. 2010)).

3

unambiguously grant the company the right to repurchase plaintiff's equity and extinguish his status as a member. The plaintiff's claims to that effect are dismissed, and the motion is granted in part. However, the company has failed to meet its burden on the motion with respect to the plaintiff's claims regarding the propriety and effect of his resignation attempts; the motion is denied in part.

## I.    BACKGROUND

On January 29, 2020, plaintiff Todd Moscowitz filed a First Amended Verified Complaint (the "Amended Complaint") in the above-captioned action against defendant Theory Entertainment LLC, a Delaware limited liability company ("Theory" or the "Company").[2]  Upon consideration of Theory's February 11, 2020, motion to dismiss (the "Motion"),[3] I accept the Amended Complaint's well-pled allegations as true, draw all reasonable inferences in the plaintiff's favor, and from those allegations and inferences, discern the following pertinent facts from the Amended Complaint and the documents integral to it.[4]

---

[2] Docket Item ("D.I.") 25 [hereinafter "Am. Compl."].

[3] D.I. 28.

[4] *See Sheldon v. Pinto Tech. Ventures, L.P.*, 220 A.3d 245, 251 (Del. 2019); *Horman v. Abney*, 2017 WL 242571, at *2 n.2 (Del. Ch. Jan. 19, 2017); *In re Gardner Denver, Inc. S'holders Litig.*, 2014 WL 715705, at *2–3 (Del. Ch. Feb. 21, 2014); *In re Gen. Motors (Hughes) S'holder Litig.*, 897 A.2d 162, 169 (Del. 2006).

### A. Moscowitz Co-Founds Theory, Receives Units As Theory's Member And Manager, And Executes An LLC Agreement And Initial Plan.

Moscowitz is a veteran music industry executive who has discovered, developed, and guided numerous recording artists, and has held many high-level managerial roles in the industry, including the role of CEO at Warner Bros. Records, US. Moscowitz co-founded Theory with Lyor Cohen, Roger Gold, and Kevin Liles. Theory does business as the imprint label 300 Entertainment ("300"), which is distributed by Atlantic Records.

Moscowitz and Cohen were Theory's founders and only members under Theory's June 5, 2013, Amended LLC Agreement. Moscowitz invested $500,000 in exchange for 25% of Theory's equity, and Cohen invested $1,500,000 for 75% of Theory's equity. Thereafter, Gold, Liles, and others joined as members, after which Theory's capital contributions were as follows: Moscowitz $400,000, Liles $400,000, and Cohen $1.2 million.

Theory's June 5, 2013, Amended LLC Agreement was then amended as the Second Amended and Restated Operating Agreement dated October 7, 2013 (the "LLC Agreement").[5] The LLC Agreement named Moscowitz and Cohen as

---

[5] Am. Compl. ¶¶ 9, 10. Plaintiff did not attach the LLC Agreement as an exhibit to the Amended Complaint. Defendant provided it as an exhibit to the Motion. S*ee* D.I. 31, Ex. A [hereinafter "LLC Agreement"]. I consider the LLC Agreement attached as an exhibit to the Motion because it is incorporated into and integral to the Amended Complaint. *See*

Theory's "Founders" and "Common Managers" on the Company's Board of Managers.[6]  Aside from Moscowitz's obligations under the LLC Agreement, Moscowitz was not required or expected to render services to Theory, and he did not have an employment agreement with Theory.

The LLC Agreement reflected Moscowitz's 11.9% total equity interest in Theory, consisting of 3,829,286 Common Units (25%) that Moscowitz received as Theory's founder, as well as 400,000 Preferred Units (2.7%).  Theory's members agreed that new members would receive Incentive-1 Units to minimize tax consequences.  Accordingly, Section 11.14 of the LLC Agreement authorized the issuance of Incentive Units "pursuant to this Agreement and the Initial Plan, or pursuant to any other option or other equity award plan of the Company properly approved pursuant to Section 11.12."[7]  The Initial Plan (or the "Plan"), effective October 4, 2013, was attached as Exhibit A to the LLC Agreement.[8]

---

*Horman*, 2017 WL 242571, at \*2 n.2; *In re Gardner Denver, Inc.*, 2014 WL 715705, at \*2–3; *In re Gen. Motors (Hughes) S'holder Litig.*, 897 A.2d at 169.

[6] Am. Compl. ¶ 10; LLC Agreement at 1, § 11.1(c).  The LLC Agreement considers that the Founders will assume duties to the Company as designated thereunder and can be terminated by the Company for failure to perform those duties.  *See* LLC Agreement § 3.1, "Cause."  The LLC Agreement also expressly eliminates any fiduciary duties that a Member, Manager, or other person might ordinarily owe Theory; waives the corporate opportunity doctrine; and contemplates and permits Members or Managers, including Moscowitz, to operate other businesses and directly compete with Theory.  *See id.* § 11.9.

[7] LLC Agreement § 11.14(a).

[8] Am. Compl. ¶ 13; *see* LLC Agreement, Ex. A.  Plaintiff did not attach the Initial Plan as an exhibit to the Amended Complaint.  Defendant provided it as an exhibit to the Motion.  S*ee* D.I. 31, Ex. B [hereinafter "Initial Plan"].  I consider the Initial Plan because it is

6

The Initial Plan provides Theory's Manager, in its sole and absolute discretion, the power to give Service Providers, defined as "eligible management personnel," an Award of Incentive-1 Units.[9] Its purpose "is to reward designated Service Providers for their performance in enhancing the value of the Company."[10] Pursuant to Section 3.1(b), "the Manager shall grant such Awards and may impose such terms and conditions on the issuance of such Awards as the Manager deems appropriate; provided, however, that no such terms may be inconsistent with the LLC Agreement."[11] The Initial Plan defines "Manager" as "Lyor Cohen, or such other Person as designated by the Board."[12]

The Initial Plan contemplates a subsequent Award Agreement for each Award granted under the Plan: "[e]ach Award granted to a Participant under this Plan is subject to the terms of the Award Agreement pursuant to which such Award was issued and the applicable provisions of this Plan and the LLC Agreement."[13] "In the event of a conflict between the provisions of this Plan and the LLC Agreement, the

---

incorporated into and integral to the Amended Complaint. *See Horman*, 2017 WL 242571, at *2 n.2; *In re Gardner Denver, Inc.*, 2014 WL 715705, at *2–3; *In re Gen. Motors (Hughes) S'holder Litig.*, 897 A.2d at 169.

[9] Initial Plan at 1.

[10] *Id.*

[11] *Id.* § 3.1(b) (emphasis in original).

[12] *Id.* § 1.4.

[13] *Id.* § 6.1.

7

provisions of the LLC Agreement shall govern."[14] A Service Provider does not become a "Participant" under the Initial Plan until he executes the requisite Award Agreement.[15] And Section 3.2 mandates that every Participant receiving an Award under the Initial Plan execute an Award Agreement:

---

[14] *Id.*; *accord id.* at 1 (stating that Incentive-1 Units granted thereunder "shall be governed by, and shall be subject to, the transfer and other restrictions contained in (a) this Plan, (b) an 'Award Agreement' . . . to be executed by and between the Company and each such Participant and (c) the [LLC Agreement], including all exhibits and schedules thereto").

[15] *Id.* § 1.5 (defining Participant as "any Service Provider who is selected by the Manager to receive an Award pursuant to the provisions of Section 3.1 who executes an Award Agreement pursuant to the provisions of Section 3.2.); *see also id.* § 3.2 (requiring Service Provider to execute an Award Agreement).

Each Award shall be issued only pursuant to an Award Agreement, and no such Award shall be effective until such Award Agreement, including any ancillary documents appended thereto, has been executed by the selected Service Provider, an officer or manager of the Company designated by the Manager on behalf of the Company and, if applicable, the Service Provider's spouse. Any such Award Agreement, and any ancillary documents appended thereto, shall contain such terms and conditions as the Manager shall determine, consistent with this Plan and with the terms of the LLC Agreement. Upon full execution of all such documents, the selected Service Provider shall become a Participant and shall, without further action on his or her part, be deemed to be a party to, signatory of and bound by the LLC Agreement. In addition, at the Company's request, such Participant and, if applicable, his or her spouse shall execute the LLC Agreement. All Awards issued under this Plan shall be subject to the terms of the LLC Agreement, this Plan and the applicable Award Agreement, which shall contain such additional terms, conditions or restrictions as the Manager shall determine (provided that such terms are not inconsistent with restrictions set forth in this Plan or the LLC Agreement), including restrictions concerning transferability, provisions regarding distributions from the Company and vesting conditions based on duration of employment or service with the Company or its subsidiaries and/or performance by the Participant and/or the Company and/or its subsidiaries.[16]

In addition to an Award Agreement, the LLC Agreement and Initial Plan require each Service Provider receiving an Award to "make a timely and effective election under Section 83(b) of the Code with respect to" the units received.[17] Section 6.4 states that "[t]he grant of such Award shall be conditioned on the Participant making such Section 83(b) election."[18]

---

[16] *Id.* § 3.2.

[17] *Id.* § 6.4; *see also* LLC Agreement § 7.8.

[18] Initial Plan § 6.4.

The Initial Plan details the Manager's discretion to condition the Award of Incentive-1 Units on forfeiture and repurchase restrictions set forth in the corresponding Award Agreement.[19]   Section 4.1 of the Initial Plan contemplates "forfeiture of awards" "upon any Termination of Service of a Participant."[20] "Termination of Service" includes resignation "with or without Cause," and

> [t]he Manager, in its absolute discretion, shall determine the effect of all matters and questions relating to Termination of Service, including when a Termination of Service is effective, the question of whether a Termination of Service resulted from a discharge for Cause, and all questions of whether particular leaves of absence constitute Terminations of Service.[21]

"Cause" "shall have the meaning set forth in [each] Participant's applicable Award Agreement."[22]   And Section 4.2(a) addresses restrictions on Awards to be determined by the Manager:   "the Incentive-1 Units shall be subject to such restrictions as the Manager shall determine in its sole discretion, including . . . repurchase rights," which "may, in the Manager's sole discretion, be contained in the applicable Award Agreement or in such other agreement as the Manager shall

---

[19] *Id.* §§ 4.1, 4.2(a).

[20] *Id.* § 4.1.

[21] *Id.* § 1.6; *see also id.* § 1.5 ("'Participant' means any Service Provider who is selected by the Manager to receive an Award pursuant to the provisions of Section 3.1 who executes an Award Agreement pursuant to the provisions of Section 3.2, and who joins the LLC Agreement as a Member.").

[22] *Id.* § 1.2.

determine, in each case in a form determined by the Manager in its sole discretion."[23]

"The issuance of the Incentive-1 Units shall be conditioned on the Participant's consent to such restrictions or the Participant's entering into such agreement or agreements."[24]

Section 5.2 further solidifies the Manager's broad discretion with respect to the Initial Plan and corresponding Award Agreements:

> The Manager shall have the power to interpret this Plan and the Award Agreements pursuant to which Awards are issued, and to adopt such rules for the administration, interpretation, and application of this Plan as are consistent therewith and to interpret, amend or revoke any such rules. Any Award under this Plan and the determinations with respect to any Award under this Plan need not be the same with respect to each Participant. All designations, determinations, interpretations, and other decisions under or with respect to this Plan or any Award or any Award Agreements pursuant to which Awards are issued shall be within the sole discretion of the Manager, may be made by the Manager at any time and shall be final, conclusive and binding upon all parties, including the Company (and any of its subsidiaries), any Participant, any holder or beneficiary of any Award and any Member.[25]

Thus, the LLC Agreement and contemporaneous Initial Plan contemplated an issuance of Incentive-1 Units, to be effective upon the recipient's execution of an Award Agreement and Section 83(b) election. The LLC Agreement and Initial Plan granted Theory's Manager with the power and discretion to award units;

---

[23] *Id.* § 4.2(a).

[24] *Id.*

[25] *Id.* § 5.2.

condition that award; determine what constitutes termination for Cause; and determine the consequences of a recipient's termination or resignation, such as forfeiture and repurchase by the Company.

### B. Moscowitz Receives An Award Of Incentive-1 Units Under The Initial Plan And Executes An Award Agreement.

In October 2013, when Theory granted Incentive-1 Units to new members, Theory also granted Moscowitz Incentive-1 Units under the Initial Plan to raise his ownership stake from 11.9% to 12%. This was done to ensure that Cohen owned 36% of Theory and that Moscowitz and Liles each owned 12%. To facilitate this 0.1% increase, Theory authorized the issuance of 46,429 Incentive-1 Units to Moscowitz, as reflected in a schedule circulated on October 8, 2013. In November 2013, Ori Winitzer, on behalf of Theory's investor LionTree, suggested preparing award agreements for those Incentive-1 Units. Accordingly, Moscowitz executed a Profit Interest Award Agreement dated December 17, 2013 (the "Award Agreement"), as contemplated and required by the Initial Plan.[26]

---

[26] Am. Compl. ¶ 16; *see also* Initial Plan § 3.2. Plaintiff did not attach the Award Agreement as an exhibit to the Amended Complaint. Defendant provided it as an exhibit to the Motion. S*ee* D.I. 31, Ex. C [hereinafter "Award Agreement"]. I consider the Award Agreement because it is incorporated into and integral to the Amended Complaint. *See Horman*, 2017 WL 242571, at *2 n.2; *In re Gardner Denver, Inc.*, 2014 WL 715705, at *2–3; *In re Gen. Motors (Hughes) S'holder Litig.*, 897 A.2d at 169.

In 2016, Theory asked Moscowitz to re-sign a corrected Award Agreement to conform the number of Incentive Units to what was reflected on the October 2013 closing capitalization table. At the time, Theory's lawyer referred to the issue as a "scrivener's

The Award Agreement provides that Moscowitz, as the "Participant," received the "Award" of 46,429 Incentive-1 Units ("Interests") "for the performance of services to or for the benefit of the Company and/or its subsidiaries in [his] capacity as a Member."[27]  It also provides,

> This Award is made pursuant to all of the provisions of the Plan and the LLC Agreement, which are incorporated herein by this reference, and is intended, and shall be interpreted in a manner, to comply therewith. In the event of any conflict between the provisions of this Agreement, the Plan and/or the LLC Agreement, the provisions of the Plan and LLC Agreement shall govern.[28]

Consistent with the Initial Plan,[29] the Award Agreement provides that "[e]ffective as of the Grant Date," December 17, 2013, the Company issued 46,429 Incentive-1 Units "under the Plan, which once the full amount of Incentive-1 Units authorized as of the Grant Date . . . has been issued, will represent a Percentage Interest of 0.1%."[30]  Moscowitz agreed that, subject to his continued provision of services to the Company, "one twenty-fourth (1/24th) of the Interests shall vest each month on each of the first twenty-four months following the Grant Date."[31]

---

error" and stated that "after investigation, we believe that the cap table amounts are correct, and that the Profit Interest Agreements themselves contained errors."  Am. Compl. ¶ 16.

[27] Award Agreement § 2.1.

[28] *Id.*

[29] Initial Plan §§ 1.5, 3.1, 3.2, 6.1.

[30] Award Agreement § 2.1.

[31] *Id.* § 3.1(a).

Section 3.3 of the Award Agreement governs the "Effect of Termination of Service on Interests," and details the instances in which Moscowitz's unvested Incentive-1, Common, and Preferred Units may be subject to forfeiture and in which the vested units of the same may be subject to repurchase.[32] "Termination of Service," as used in the Award Agreement is defined in the Initial Plan as

> the termination, for any reason, including death, Disability, resignation, retirement or termination with or without Cause, at any time, of the Service Provider's employment or other service with the Company (or any of its subsidiaries), but excluding any termination which includes simultaneous continuous service of the Participant with the Company (or any of its subsidiaries).[33]

Cohen as "Manager" has "absolute discretion" to "all matters and questions relating to Termination of Service" under the Award Agreement, "including when a Termination of Service is effective" and "the question of whether a Termination of Service resulted from a discharge for Cause."[34]

Sections 1.2 and 3.3 of the Award Agreement contemplate the consequences of the Participant's Termination of Service. In Section 1.2, termination by the Company is for "Cause" upon "the occurrence or existence" of certain events, "as

---

[32] *Id.* § 3.3.

[33] Initial Plan § 1.6; *see also* Award Agreement § 1 ("Capitalized terms used in this Agreement but not otherwise defined herein shall have their respective meanings set forth in the [LLC Agreement], including all exhibits and schedules thereto . . . and the [Initial Plan] included as Exhibit A of the LLC Agreement . . . , as applicable.").

[34] Initial Plan § 1.6.

14

determined in good faith by the Manager,"[35] including "[a] material violation of this Agreement that, if curable, is not cured within 30 days after written notice describing such violation has been given to such person."[36]  In Section 3.3, termination by the Participant is for Cause "in the event Participant voluntarily terminates Participant's service and fails to provide the Manager with written notice at least ninety (90) days in advance of such Termination of Service (such ninety (90)-day period, the 'Notice Period')."[37]  "In the event of Participant's Termination of Service by the Company for Cause," as that term is defined in the Award Agreement, the termination is considered a "Forfeiture Termination."[38]

> Upon a Forfeiture Termination, the Participant's unvested Interests
>
> shall thereupon automatically and without further action be cancelled and forfeited for no consideration effective as of Participant's Termination of Service, and Participant shall have no further right or interest in or with respect to such Interests.[39]

A Forfeiture Termination also triggers the Company's right to repurchase the Participant's vested Interests, as well as his Common and Preferred Units, at predetermined prices:

---

[35] Award Agreement § 1.2.

[36] *Id.* § 1.2(a).

[37] *Id.* § 3.3(a); *see also* LLC Agreement § 17.2 (requiring that all notice thereunder be written).

[38] Award Agreement § 3.3(b).

[39] *Id.*; *see id.* § 2.1 (defining "Interests").

15

upon the occurrence of a Forfeiture Termination, the Company shall have the option (exercisable by the Company within the one (1)-year period immediately following the date of such Termination of Service) to repurchase the Participant's vested Interests, as well as Participant's vested Common Units and Participant's Preferred Units, if any, including (in each case) Participant's Capital Account balance that is attributable to such Interests, Common Units and Preferred Units, as applicable, at the repurchase price set forth below:

(i)    in respect of vested Interests, the repurchase price shall be $0.10 per Incentive- I Unit repurchased;

(ii)    in respect of Participant's Common Units, the repurchase price shall be the lesser of (1) the Fair Market Value of such Common Units and (2) the greater of (A) the original cost (or exercise price, as applicable, in the event of Common Units issued in exchange for Preferred Units) paid by the Participant in respect of such Common Units and (B) $0.10 per Common Unit; and

(iii)    in respect of Participant's Preferred Units, the repurchase price shall be the Fair Market Value of such Preferred Units.[40]

If the Participant's termination is "other than for Cause," under Section 3.3(a), "subject . . . to Participant delivering and not revoking a release of claims in favor of the Company and its Affiliates, Participant's vested Interests shall remain outstanding (subject to all terms of the LLC Agreement, including those regarding repurchase)."[41]  But unvested Incentive-1 Units

---

[40] *Id.* § 3.3(b).

[41] *Id.* § 3.3(a).

shall automatically and without further action be cancelled and forfeited for no consideration effective (i) in the event of Termination of Service for any reason other than Cause or death, as of Participant's Termination of Service . . . , and Participant shall have no further right or interest in or with respect to such unvested Interests.[42]

And if termination is "for any reason other than a Forfeiture Termination," the Company has a one-year "Call Right," or the right to repurchase the Participant's vested Incentive-1, Common, and Preferred Units, upon the Participant's Termination of Service:

> [T]he Company or its designee, in its sole discretion, may exercise a right to repurchase for Fair Market Value some or all of Participant's vested Interests, vested Common Units and Preferred Units (the "Call Right") until the one (1)-year anniversary of the date of Participant's Termination of Service. If the Company chooses to exercise the Call Right, in its sole discretion, the Company may either (a) pay to Participant in cash the Fair Market Value of the repurchased Interests, Common Units and Preferred Units or (b) issue to Participant a note bearing interest at a rate equal to the London Interbank Offered Rate at the time of issuance plus 200 basis points (the "Note"). . . . Upon exercise of the Call Right, the repurchased Interests, Common Units and Preferred Units shall be cancelled by the Company without any further action of Participant, and Participant shall have no further right or interest in or with respect to such Interests.[43]

Thus, the Award Agreement contemplates the various reasons for and manner in which the Participant and the Company could part ways, and stratifies the Participant's ability to keep and monetize his Incentive-1, Preferred, and Common

---

[42] *Id.*

[43] *Id.* § 3.4.

Units based on the nature of his termination. A voluntary resignation without notice, as a Termination for Cause, is a Forfeiture Termination that triggers the Company's repurchase right at lower prices than the Call Right, which is triggered by termination for any reason other than a Forfeiture Termination.

When Moscowitz executed the Award Agreement, he also executed an Election Pursuant to Section 83(b) of the Internal Revenue Code (the "83(b) Election"), stating that "the date on which the above property was transferred to the undersigned was December 17, 2013, and the taxable year to which this election relates is 2013."[44] The 83(b) Election also recognizes that the Award is subject to

---

[44] Award Agreement, Ex. A ¶ 3. Over Moscowitz's objection, I conclude the 83(b) Election is properly considered on Theory's Motion because it is attached as an exhibit to the Award Agreement, which is integral to the Complaint. *See Winshall v. Viacom Int'l, Inc.*, 76 A.3d 808, 818 (Del. 2013).. Under the incorporation-by-reference doctrine, "[a] plaintiff may not reference certain documents outside the complaint and at the same time prevent the court from considering those documents' actual terms." *Reiter v. Fairbank*, 2016 WL 6081823, at *5–6 (Del. Ch. Oct. 18, 2016) (alteration in original) (quoting *Winshall*, 76 A.3d at 818); *see also Amalgamated Bank v. Yahoo! Inc.*, 132 A.3d 752, 797 (Del. Ch. 2016) (providing extensive summary of the incorporation-by-reference doctrine), *abrogated on other grounds by Tiger v. Boast Apparel, Inc.*, 214 A.3d 933 (Del. 2019). The Amended Complaint extensively cites and refers to the Award Agreement and Initial Plan. The 83(b) Election is an exhibit to and part of the Award Agreement, which is unquestionably integral to the Amended Complaint, but which Moscowitz failed to provide. Moscowitz may not reference the Award Agreement "and at the same time prevent the court from considering [the] document['s] actual terms" in connection with a motion to dismiss. *Winshall*, 76 A.3d at 818 (quoting *Fletcher Int'l, Ltd. v. ION Geophysical Corp.*, 2011 WL 1167088, at *3 n.17 (Del. Ch. Mar. 29, 2011)). Theory has provided and referred to the omitted exhibit to the Award Agreement, and in "doing so fairly represents the selective portions the plaintiffs have submitted into the record." *In re Gen. Motors (Hughes) S'holder Litig.*, 2005 WL 1089021, at *6 (Del. Ch. May 4, 2005) ("Surely plaintiffs do not contend that the Court is not entitled to consider the full context of a document once the plaintiffs have relied on particular segments in their Complaint?"), *aff'd*, 897 A.2d 162 (Del. 2006). "The better practice would have been for

18

certain restrictions, including "forfeiture and/or a right of repurchase by the Company or its designee if the undersigned ceases to provide services to the Company or one of its Affiliates or otherwise breaches Participant's obligations to the Company" and any other restrictions set forth in the Award Agreement and LLC Agreement.[45]

### C.    Moscowitz Resigns From Theory.

In spring 2016, Moscowitz verbally advised Cohen that he intended to leave Theory. Cohen retaliated in April by removing Moscowitz as a voting member of the Board and replacing him with Liles. Moscowitz was excluded from Company meetings and key decisions.

In June, Moscowitz discussed the possibility of Theory purchasing his stock with LionTree's Winitizer, stating that he wanted additional cash flow, and that if he did not receive it, he would need to leave. Winitzer responded that Moscowitz's stock purchase proposal was "quite thoughtful," but advised him that Theory

---

plaintiff[] to set forth the entire contract or to attach that document to the [Amended] Complaint in the first place . . . ." *Lewis v. Straetz*, 1986 WL 2252, at *3 (Del. Ch. Feb. 12, 1986) (quoting *Bechtel v. Local 215, Laborers' Int. Union of N. Am.*, AFL-CIO, 405 F. Supp. 370, 374 n.1 (M.D. Pa. 1975), *aff'd in part, rev'd in part on other grounds*, 544 F.2d 1207 (3d Cir. 1976)).

[45] Award Agreement, Ex. A ¶ 4.

"need[ed] the capital first (the more we have, the easier for you) and then we can revisit."[46]  No purchase plan materialized, and Moscowitz focused on his departure.

In September, Cohen announced that he was leaving 300, and therefore Theory, to become YouTube's Global Head of Music.  When Cohen advised Theory's Board of his departure, Moscowitz told Cohen that "the news did not change his own plans and, as previously indicated months before, Moscowitz still was planning to leave."[47]  Cohen and YouTube's owner, Google, Inc., remain two of Theory's largest investors.  In October, allegedly related to Cohen's transition to YouTube, Theory launched a self-tender for $17,000,000 of Theory equity (the "Tender Offer").

On November 7, Moscowitz sent Theory a formal notice of resignation dated November 1, 2016 (the "Resignation Notice").[48]  The Resignation Notice states that in accordance with the terms of the LLC Agreement, Moscowitz "hereby gives notice of [his] immediate resignation as a Manager of the Company and from any

---

[46] Am. Compl. ¶ 20.

[47] *Id.* ¶ 22.

[48] *Id.* ¶ 23.  Plaintiff did not attach the Resignation Notice as an exhibit to the Amended Complaint.  Defendant provided it as an exhibit to the Motion.  S*ee* D.I. 31, Ex. D [hereinafter "Resignation Notice"].  I consider the Resignation Notice because it is incorporated into and integral to the Amended Complaint. *See Horman*, 2017 WL 242571, at *2 n.2; *In re Gardner Denver, Inc.*, 2014 WL 715705, at *2–3; *In re Gen. Motors (Hughes) S'holder Litig.*, 897 A.2d at 169.

and all positions [he] hold[s] or ha[s] held with the Company, arising under the Agreement, or otherwise."[49]

But, even while resigning, Moscowitz strove to retain all the benefits from his membership in Theory. His Resignation Notice went on:

> Notwithstanding the foregoing, the undersigned has in no way surrendered, waived or in any way modified any of my rights, benefits or entitlements as a Member or as an owner of a membership interest in the Company or any successor in interest of the Company.
>
> If for any reason, whatsoever, a court of competent jurisdiction determines that the foregoing resignation shall result in the loss, forfeiture, diminution or waiver of the undersigned's rights and/or entitlements as a Member or owner of a membership interest in the Company, the foregoing resignation shall be deemed void, _ab initio_, and of no force or effect.[50]

On November 10, Moscowitz and Universal Music Group issued a joint press release announcing their joint venture, Cold Heat Records, which is now known as Alamo Records.

On November 11, Theory's Board of Managers notified Moscowitz via email that it accepted his "immediate voluntary resignation," "consistent with the [LLC Agreement], and the [Initial Plan]" (the "Board Notice").[51] Although the Board

---

[49] Resignation Notice at 1.

[50] _Id._ (emphasis in original).

[51] D.I. 40 at 1. Plaintiff did not attach the Board Notice as an exhibit to the Amended Complaint. Defendant provided it to the Court. S_ee id._ I consider the Board Notice because it is incorporated into and integral to the Amended Complaint. _See Horman_, 2017

Notice did not explicitly address the conditions Moscowitz imposed on his resignation, it stated, "The Company hereby reserves and does not waive any rights it has with respect to the foregoing, including with respect to any rights it has under the [LLC] Agreement, the Initial Plan and the [Award Agreement] between the Company and you."[52]

On November 18, Moscowitz accepted the Tender Offer, expressing that he intended to sell Theory 400,000 Preferred Units and 1,049,489 Common Units. Theory bought Moscowitz's tendered shares for $1.648 per unit, totaling $2,388,575.87. Thereafter, Moscowitz held 2,798,797 Common Units and 46,429 Incentive-1 Units (the "Remaining Units").

### D. Theory Exercises Its Repurchase Right Under The Award Agreement, And Moscowitz Reneges His Resignation.

Two months later, Theory notified Moscowitz that it determined his resignation constituted Termination of Service for Cause under the Award Agreement. In a letter dated January 17, 2017 (the "Repurchase Letter"), Theory stated that Moscowitz violated the Award Agreement by failing to provide the Company with 90 days' written notice of his voluntary Termination of Service. Accordingly, Theory deemed Moscowitz's resignation a termination for Cause, and

WL 242571, at *2 n.2; *In re Gardner Denver, Inc.*, 2014 WL 715705, at *2–3; *In re Gen. Motors (Hughes) S'holder Litig.*, 897 A.2d at 169.

[52] D.I. 40 at 1.

therefore a Forfeiture Termination, under the Award Agreement. Theory explained it was exercising its right to repurchase Moscowitz's Remaining Units at the predetermined Forfeiture Termination price of $0.10 per unit, for a total of $283,622.60. Theory included a check payable to Moscowitz in that amount, and informed Moscowitz that the repurchase extinguished his interest and membership in Theory.

In response to the Repurchase Letter, Moscowitz took three steps. First, in a letter dated February 1 (the "Revocation Letter"), Moscowitz "emphasiz[ed] that the [Resignation Notice] was expressly conditioned upon the premise that it would not cause him to surrender, waive, diminish, or modify any of his rights, benefits or entitlements as a member of Theory or as an owner of a membership interest in Theory."[53] The Revocation Letter also purported to "rescind[] and withdr[a]w" the Resignation Notice, and "expressed Moscowitz's ability and willingness to return to work for Theory (though he disputed that such an obligation existed under the [LLC] Agreement)."[54] Moscowitz returned the $283,622.60 repurchase check with the Revocation Letter.

Second, after purportedly revoking his initial resignation via the Revocation Letter, Moscowitz tried to resign in a manner that would not trigger any repurchase

---

[53] Am. Compl. ¶ 29.

[54] *Id.*

23

right.  On February 1, Moscowitz sent Theory a letter in which he purported to resign from Theory on 90 days' notice and expressly stated that such notice superseded his Resignation Notice (the "Second Resignation Notice").  Once again, Moscowitz attempted to impose conditions on his resignation, stating that nothing in the Second Resignation Notice "should be construed as a surrender, waiver, or modification of his rights, benefits or entitlements as a member or as an owner of any membership interest in Theory," and that "if such resignation resulted in a loss, forfeiture, diminution or waiver of his rights and/or entitlements as a member or owner of a membership interest, then the resignation was of no force or effect."[55]

Third, Moscowitz reiterated his position though counsel via a letter to Theory on February 3.  On February 8, Theory responded via letter, maintaining that the Award Agreement gave the Company the right to repurchase Moscowitz's Remaining Units at $0.10 per share.  Through new counsel, Moscowitz again protested Theory's position; Theory reiterated that Moscowitz forfeited his interest in the Company.

### E.     Moscowitz Files This Action.

Alleging that he has not yet been paid for his Remaining Units and "does not know what became of them because Theory ceased treating him as a unitholder,"[56]

---

[55] *Id.* ¶ 30.

[56] *Id.* ¶ 33.

Moscowitz filed a Verified Complaint initiating this action on September 27, 2019.[57]

Theory moved to dismiss on November 25.[58] In response, Moscowitz filed the

Amended Complaint on January 29, 2020.[59]

Count I of the Amended Complaint seeks a declaratory judgment that the Award Agreement is invalid for lack of consideration. Count II seeks a declaratory judgment that Moscowitz is a Theory member owning 2,789,797 Common and 46,429 Incentive-1 Units; that Moscowitz's Resignation Notice is of no force and effect; that Moscowitz's Second Resignation Notice validly effected his resignation; and that Theory's Forfeiture Termination is of no force and effect. Count III asserts an alternative claim for breach of the Award Agreement, assuming the Award Agreement is binding, claiming Theory breached by

> purporting to redeem Moscowitz's membership Units; failing to give notice to Moscowitz of any purported breach of the Award Agreement; failing to provide any opportunity to cure such breach to Moscowitz; improperly construing the Award Agreement such that Moscowitz's [Resignation Notice] gives rise to a Forfeiture Termination; improperly terminating Moscowitz's membership interest in Theory; and converting, alienating, or otherwise dealing with Moscowitz's Units and/or membership interest without Moscowitz's consent.[60]

---

[57] D.I. 1.

[58] D.I. 17.

[59] *See generally* Am. Compl.

[60] *Id.* ¶ 51.

Count IV asserts a claim for breach of the implied covenant of good faith and fair dealing, alleging that the LLC Agreement and Award Agreement are binding and that Theory breached the implied covenants therein for identical reasons.[61] Count V asserts a claim for conversion, and Count VI seeks an accounting and specific performance.

Theory filed the Motion on February 11.[62] On April 10, Theory submitted its opening brief in support.[63] On June 8, Moscowitz opposed the Motion.[64] Theory replied on June 29.[65] I heard argument on July 15.[66]

## II. ANALYSIS

This opinion addresses Theory's Motion pursuant to Court of Chancery Rule 12(b)(6). "The standard for dismissal pursuant to Rule 12(b)(6) for failure to state a claim upon which relief can be granted is well established."[67] The Court accepts all

---

[61] *See id.* ¶ 62 ("Theory has breached this implied contractual term, inter alia, by failing to give notice to Moscowitz of any defect in his resignation; failing to provide Moscowitz any opportunity to cure such breach; improperly construing the Award Agreement such that Moscowitz's [Resignation Notice] gave rise to a Forfeiture Termination; improperly terminating Moscowitz's membership interest in Theory; and converting, alienating, or otherwise dealing with Moscowitz's Units and/or membership interest without Moscowitz's consent.").

[62] D.I. 28.

[63] D.I. 31.

[64] D.I. 33.

[65] D.I. 35; *see also* D.I. 40, 42.

[66] D.I. 43, 46.

[67] *Feldman v. Cutaia*, 2006 WL 920420, at *7 (Del. Ch. Apr. 5, 2006).

well-pled allegations as true and draws all reasonable inferences in favor of the non-movant.[68]  However, the Court "need not accept conclusory allegations as true, nor should inferences be drawn unless they are truly reasonable."[69]  The Court will not grant dismissal "unless the plaintiff would not be entitled to recover under any reasonably conceivable set of circumstances."[70]  A motion to dismiss will be granted only if "it appears with reasonable certainty that the plaintiff could not prevail on any set of facts that can be inferred from the pleading."[71]  "Under Rule 12(b)(6), a complaint may, despite allegations to the contrary, be dismissed where the unambiguous language of documents upon which the claims are based contradict the complaint's allegations."[72]

Theory seeks dismissal on the basis that its conduct is authorized by the plain language of the LLC Agreement, Initial Plan, and Award Agreement (collectively, the "Agreements"), precluding each theory of recovery in the Amended Complaint. And so the Amended Complaint and Motion turn primarily on questions of contract interpretation.  "Under Delaware law, the proper interpretation of language in a

---

[68] *Sheldon*, 220 A.3d at 251.

[69] *Id.*

[70] *Cent. Mortg. Co. v. Morgan Stanley Mortg. Cap. Hldgs. LLC*, 27 A.3d 531, 535 (Del. 2011).

[71] *Feldman*, 2006 WL 920420, at *7.

[72] *H-M Wexford LLC v. Encorp, Inc.*, 832 A.2d 129, 139 (Del. Ch. 2003).

contract is a question of law. Accordingly, a motion to dismiss is a proper framework for determining the meaning of contract language."[73]

> The principles governing contract interpretation are well settled. Contracts must be construed as a whole, to give effect to the intentions of the parties. Where the contract language is clear and unambiguous, the parties' intent is ascertained by giving the language its ordinary and usual meaning. Courts consider extrinsic evidence to interpret the agreement only if there is an ambiguity in the contract.[74]

Contract language is ambiguous if it is "reasonably susceptible of two or more interpretations or may have two or more different meanings."[75]

"When interpreting a contract, a court must give effect to all of the terms of the instrument and read it in a way that, if possible, reconciles all of its provisions."[76] "[A] court will prefer an interpretation that harmonizes the provisions in a contract as opposed to one that creates an inconsistency or surplusage."[77] "Contract terms themselves will be controlling when they establish the parties' common meaning so that a reasonable person in the position of either party would have no expectations inconsistent with the contract language."[78]

---

[73] *Allied Cap. Corp. v. GC-Sun Hldgs., L.P.*, 910 A.2d 1020, 1030 (Del. Ch. 2006).

[74] *Nw. Nat'l Ins. Co. v. Esmark, Inc.*, 672 A.2d 41, 43 (Del. 1996) (citations omitted).

[75] *Twin City Fire Ins. Co. v. Del. Racing Ass'n*, 840 A.2d 624, 628 (Del. 2003) (quoting *Kaiser Alum. Corp. v. Matheson*, 681 A.2d 392, 395 (Del. 1996)).

[76] *GRT, Inc. v. Marathon GTF Tech., Ltd.*, 2012 WL 2356489, at *4 (Del. Ch. June 21, 2012).

[77] *Id.*

[78] *Eagle Indus., Inc. v. DeVilbiss Health Care, Inc.*, 702 A.2d 1228, 1232 (Del. 1997).

Consistent with Delaware's pro-contractarian policy, "a party may not come to court to enforce a contractual right that it did not obtain for itself at the negotiating table."[79] Delaware law presumes parties are bound by the language of the agreement they negotiated, especially when the parties are sophisticated entities that have engaged in arms-length negotiations.[80] The Court "will not disturb a bargain because, in retrospect, it appears to have been a poor one."[81] "Parties have a right to enter into good and bad contracts, the law enforces both."[82]

### A. The Award Agreement Binds Moscowitz.

I first address Count I's request that the Court enter a declaratory judgment that the Award Agreement is invalid for lack of consideration and that, therefore, Moscowitz is not bound by its terms. The plain contract language that the parties agreed upon indicates that Moscowitz's Incentive-1 Units were consideration for executing the Award Agreement. Count I is dismissed.[83]

---

[79] *GRT, Inc.*, 2012 WL 2356489, at *7.

[80] *See W. Willow-Bay Ct., LLC v. Robino-Bay Ct. Plaza, LLC*, 2007 WL 3317551, at *9 (Del. Ch. Nov. 2, 2007) ("The presumption that the parties are bound by the language of the agreement they negotiated applies with even greater force when the parties are sophisticated entities that have engaged in arms-length negotiations."), *aff'd*, 985 A.2d 391 (Del. 2009); *accord HC Cos., Inc.*, 2017 WL 6016573, at *5.

[81] *W. Willow-Bay Ct., LLC*, 2007 WL 3317551, at *9.

[82] *Nemec*, 991 A.2d at 1126.

[83] "Parties to a contract can seek declaratory judgment to determine 'any question of construction or validity' and can seek a declaration of 'rights, status or other legal relations thereunder.'" *Energy P'rs, Ltd. v. Stone Energy Corp.*, 2006 WL 2947483, at *6 (Del. Ch. Oct. 11, 2006) (quoting 10 *Del. C.* § 6502). The party seeking a declaratory judgment must

Drawing all reasonable inferences that logically flow from well-pled facts in the plaintiff's favor, this Court can properly determine the validity and effect of consideration at the motion to dismiss stage.[84] "It is the blackest of black-letter law that an enforceable contract requires an offer, acceptance, and consideration."[85] As the Delaware Supreme Court has explained, "it is well settled that consideration for a contract can consist of either a benefit to the promiser or a detriment to the promisee."[86] Delaware law does not "assume[] that parties to a contract must explicitly detail the precise consideration they are exchanging" and "makes no such requirement,"[87] but a recital in a written agreement that a stated consideration has

---

demonstrate that an "actual controversy" exists. *See id.* Theory couched its contention that the governing Agreements refute Moscowitz's claim as a failure to plead the existence of an actual controversy. I reject Theory's position that its accurate reading of the contracts means there is no actual controversy to support Count I. As demonstrated by their briefs, the parties have adverse legal interests and hold divergent views about the effectiveness and meaning of the Award Agreement; a controversy exists between Moscowitz and Theory. The Amended Complaint adequately identifies an actual controversy between Moscowitz and Theory about the validity and enforceability of the Award Agreement. *See id.* at *6–9. But Theory interprets the Agreements correctly, so I proceed on that basis.

[84] *See Seiden v. Kaneko*, 2015 WL 7289338, at *5–6 (Del. Ch. Nov. 3, 2015); *Seiden v. Kaneko (Seiden II)*, 2017 WL 1093937, at *4 (Del. Ch. Mar. 22, 2017), *aff'd*, 177 A.3d 69 (Del. 2017); *see also Acker v. Transurgical, Inc.*, 2004 WL 1230945, at *3–4 (Del. Ch. Apr. 22, 2004) (granting dismissal under Court of Chancery Rule 12(b)(6) of claim for declaration that contract was void for lack of consideration).

[85] *Seiden II*, 2017 WL 1093937, at *5 (quoting *James J. Gory Mech. Contr., Inc. v. BPG Residential P'rs V, LLC*, 2011 WL 6935279, at *2 (Del. Ch. Dec. 30, 2011)).

[86] *Id.* (quoting *First Mortg. Co. of Pa. v. Fed. Leasing Corp.*, 456 A.2d 794, 795–96 (Del. 1982)).

[87] *Id.* at *6.

been given facially supports a finding that the agreement is supported by consideration, absent facts suggesting that no such consideration was actually given or expected.[88] "An allegation that a party has received no consideration is a conclusion of law and is not entitled to deference."[89]

### 1. The Award Agreement Applies to Moscowitz.

As an initial matter, Moscowitz argues the Award Agreement's Termination of Service and Forfeiture provisions do not apply to him. He makes two arguments based on the Award Agreement's language stating the Incentive-1 Units were issued to "eligible management personnel" "for the performance of services to or for the benefit of" Theory in his "capacity as a Member."[90]

First, Mosowitz theorizes that the Award Agreement's Notice Period for resignation was designed to retain employees, and that because Moscowitz is not an employee, it does not apply to him. Moscowitz contends that "[a]s a co-founder of

---

[88] *See TA Operating LLC v. Comdata, Inc.*, 2017 WL 3981138, at *23 (Del. Ch. Sept. 11, 2017) (stating that where a contract contains a recital of consideration, it suggests, "on its face," that the parties exchanged valuable consideration); *see also* Restatement (Second) of Contracts § 87 cmt. c (1981) ("A recital in a written agreement that a stated consideration has been given is evidence of that fact as against a party to the agreement, but such a recital may ordinarily be contradicted by evidence that no such consideration was given or expected."); *id.* § 218 cmt. b ("A recital of fact in an integrated agreement is evidence of the fact, and its weight depends on the circumstances. Contrary facts may be proved."); *id.* § 218 cmt. e ("Where consideration is required, the requirement is not satisfied by a false recital of consideration, although in some circumstances a recital of consideration may make a promise binding without consideration.").

[89] *Acker*, 2004 WL 1230945, at *4.

[90] Award Agreement § 2.1; Initial Plan at 1, § 3.3.

Theory, he was not required to perform services to Theory, and he was not granted Incentive-1 Units to encourage his continued employment with the Company."[91]  He pleads that he was not a Theory employee, was not subject to an employment contract, and had no "required duties or responsibilities at Theory."[92]  Moscowitz concludes there is a question of fact as to whether he was actually a "Service Provider" (defined as "eligible management personnel") under the Initial Plan, and "Participant" (defined as a "Service Provider who . . . executes an Award Agreement") under the Award Agreement.[93]

The Award Agreement is not limited in whole or in part to employees.  The entire Award Agreement applies to any Service Provider who became a Participant by agreeing to accept units thereunder.  The LLC Agreement contemplates that Incentive-1 Units "will be reserved for issuance to officers, key employees, consultants and other Persons who provide services to the Company" or the "Management Pool."[94]  It further explains that all Incentive Units awarded outside of the context of an option "are received in exchange for the provision of services by such recipient to or for the benefit of the Company in a service provider capacity

---

[91] D.I. 33 at 39.

[92] *See id.* at 36; *see also id.* at 34 n.7.

[93] Initial Plan at 1, § 1.5; Award Agreement at 1, § 1.

[94] LLC Agreement § 11.14(a).

or in anticipation of becoming a service provider."[95]  The Award Agreement in whole, and its Notice Period in particular part, are not limited to employees.

Second, Moscowitz contends the Resignation Notice submitted his resignation as Manager, but not as Member, and argues that because he does not provide services as a Member, the Award Agreement's provisions regarding Termination of Service does not apply to him.  But even assuming that Moscowitz could and did resign as a Manager but not as a Member, his resignation as Manager still meets the plain definition of a Termination of Service.  The Initial Plan defines "Termination of Service" as "the termination, for any reason, including . . . resignation, of the Service Provider's employment or other service with the Company, but excluding any termination which includes simultaneous continuous service of the Participant."[96]  Taking as true Moscowitz's contention that he did not provide services as Member, his resignation as Manager comprises a Termination of Service that permits the Company to repurchase his equity under the Award Agreement.  This is a logical reading of the Award Agreement:  if a Service Provider no longer wishes to provide any services to the Company, the Company has the option to make a clean break as to equity as well.[97]

---

[95] *Id.* § 11.14(b).

[96] Initial Plan § 1.6.

[97] *See Focus Fin. P'rs, LLC, v. Holsopple*, 2020 WL 6266915, at *19 (Del. Ch. Oct. 26,2020) (concluding that in "a manager-managed LLC in which holders of units have minimal rights," where an agreement granting units contains provisions regarding or

33

## 2. The Award Agreement Is Supported By Consideration.

Moscowitz contends that the Incentive-1 Units were not consideration for the Award Agreement because he already owned those Units when he executed the Award Agreement. He alleges that a schedule circulated on October 8, 2013 reflected he owned 46,429 Incentive-1 Units, and asks the Court to infer therefrom that he acquired the Incentive-1 Units in October 2013, rather than December 2013 when he executed the Award Agreement.[98] He also alleges that the Award Agreement materialized upon LionTree's mere suggestion, and argues the Court should infer that the Award Agreement was an "afterthought."[99] Moscowitz's position is undermined by the Initial Plan and Award Agreement, and the inferences he asks the Court to make in considering the schedule and impetus for the Award Agreement are not reasonable.

Each of the Agreements provides that it is supported by valuable consideration. The LLC Agreement plainly states that "in consideration of the mutual promises herein contained and for other good and valuable consideration, the

---

restricting the unitholder's provision of services, those provisions pertain not to the unitholder's status as a unitholder, but rather to his status as a service provider).

[98] Am. Compl. ¶ 15; D.I. 33 at 17.

[99] D.I. 33 at 6; *see also id.* at 17–18; Am. Compl. ¶ 16.

receipt and sufficiency of which are hereby acknowledged,"[100] Moscowitz agreed to be bound by its terms, including the Initial Plan.[101]

The Initial Plan in turn makes clear that additional issuances would be effective upon, and therefore consideration for, an Award Agreement. The Initial Plan provides that Service Providers "*may* be granted" an Award of Incentive-1 Units thereunder,[102] as the Manager "*may* from time to time, in its sole and absolute discretion"[103] determine in exchange "for the performance of services to or for the benefit of the Company or its subsidiaries . . . in the Participant's capacity as a Member."[104] It also mandates that for an eligible Service Provider to become a "Participant" in receipt of the Award, the Service Provider must execute an Award Agreement in the form to be determined by the Manager.[105] And "each Award

---

[100] LLC Agreement at 1.

[101] *See id.* (stating the "Existing Members, by their execution hereof, hereby approve the amendment and restatement of the Amended LLC Agreement to this Agreement, and approve the rights, preferences, privileges and restrictions of the Members of the Company as set forth in this Agreement"); *id.* § 11.14 (authorizing issuance of Incentive-1 Units under the Initial Plan attached as Exhibit A to the LLC Agreement); *see generally* Initial Plan.

[102] Initial Plan § 2.1 (emphasis added).

[103] *Id.* § 3.1(a) (emphasis added).

[104] *Id.* § 3.3.

[105] *See id.* § 3.2 ("Each Award shall be issued *only* pursuant to an Award Agreement, and *no such Award shall be effective until such Award Agreement, including any ancillary documents appended thereto, has been executed* by the selected Service Provider. . . . Upon full execution of [any such Award Agreement, and any ancillary documents appended thereto], the selected Service Provider shall become a Participant . . . ." (emphasis added)); *see also id.* §§ 1.1, 1.5, 3.1, 3.4, 4.1, 4.2.

granted to a Participant under this Plan is subject to the terms of the Award Agreement *pursuant to which such Award was issued* and the applicable provisions of this Plan and the LLC Agreement."[106] Thus, while the Initial Plan empowers the Manager to authorize an issuance of Incentive-1 Units, and conditions that issuance on the Service Provider's execution of an Award Agreement, the Initial Plan does not effectuate that issuance.

The issuance is accomplished by the Award Agreement, which unambiguously provides the Award issues and becomes effective upon the Award Agreement's execution. The Award Agreement provides that "[e]ffective *as of* the Grant Date," December 17, 2013, the Company issued the Award "under the Plan, which, once the full amount of Incentive-1 Units authorized *as of* the Grant Date . . . *has been issued*, *will represent* a Percentage Interest of 0.1%,"[107] and identifies a vesting schedule.[108] Moscowitz, as the Participant, acknowledged receipt of 46,429 Incentive-1 Units as of that date in exchange for his "performance of services to or for the benefit of the Company and/or its subsidiaries in [his] capacity as a

---

[106] *Id.* § 6.1 (emphasis added); *accord id.* at 1 (stating that Incentive-1 Units granted thereunder "shall be governed by, and shall be subject to, the transfer and other restrictions contained in (a) this Plan, (b) an 'Award Agreement' . . . to be executed by and between the Company and each such Participant and (c) the [LLC Agreement], including all exhibits and schedules thereto").

[107] Award Agreement § 2.1 (emphasis added).

[108] *Id.* § 3.1(a).

Member;"[109] his vesting schedule based on his continued provision of services;[110] and his agreement to the terms and restrictions.[111]

The Initial Plan and Award Agreement also plainly provide that each recipient must execute a Section 83(b) election for the Award to issue.[112] Moscowitz executed that 83(b) Election, attached as Exhibit A to the Award Agreement.[113] He attested therein that "the date on which the above property was transferred to the undersigned was December 17, 2013, and the taxable year to which this election relates is 2013."[114]

From the Initial Plan's plain terms, Incentive-1 Units issue and vest only upon the execution of an Award Agreement and corresponding 83(b) Election. The Agreements and 83(b) Election unambiguously provide that Theory issued Moscowitz 46,429 Incentive-1 Units on December 13, 2013, as present consideration for the Award Agreement.[115] The October schedule does not support

---

[109] *Id.* § 2.1.

[110] *Id.* § 3.1(a).

[111] *See id.* § 2.1.

[112] *Id.* § 7; Initial Plan § 6.4.

[113] *See* Award Agreement, Ex. A.

[114] *Id.* ¶ 3.

[115] *See Seiden II*, 2017 WL 1093937, at *6–7 (holding that an agreement was supported by present consideration where nothing in the agreement itself supported an inference that the consideration given was "past consideration" or nothing more than the party "was already entitled to receive," and rejecting the nonmovant's attempts to create issues of fact as to those points); *see also James J. Gory Mech. Contr., Inc.*, 2011 WL 6935279, at *2 ("A commitment to honor a pre-existing obligation works neither benefit nor detriment;

a reasonable inference that the Award issued or became effective upon the schedule's distribution.[116] The more reasonable inference is that the schedule reflected the anticipated issuance. And LionTree's suggestion may have spurred the Award Agreement's execution, but there is no basis to conclude the Award Agreement did not effectuate the issuance as it, and the Initial Plan, contemplated. Moscowitz's allegations, in the context of the Agreements, do not state a claim that the Award Agreement lacked consideration.

Moscowitz also contends the 46,429 Incentive-1 Units are inadequate consideration for the Award Agreement's consequences, and that the Initial Plan and Award Agreement are unenforceable because he was unfairly surprised by their terms. Moscowitz contends that he "agreed to accept the Incentive-1 Units to address Theory's math (and associated tax) problem," but he did not foresee that he would risk losing his *entire* equity stake in Theory by accepting another 0.1% of the

---

therefore, 'a promise to fulfill a pre-existing duty, such as a promise to pay a debt owed, cannot support a binding contract' because consideration for the promise is lacking." (alteration omitted) (quoting *First State Staffing Plus, Inc. v. Montgomery Mut. Ins. Co.*, 2005 WL 2173993, at *9 (Del. Ch. Sept. 6, 2005))).

[116] *See Seiden II*, 2017 WL 1093937, at *6–7 (looking to the terms of the agreement at issue to determine whether it was supported by consideration); *Acker*, 2004 WL 1230945, at *3–4 (rejecting argument that an agreement was unsupported by consideration where the complaint and documents integral to it "plead[] . . . out a viable claim that the [agreements] were without consideration"); *H-M Wexford LLC*, 832 A.2d at 139 (stating a claim is dismissed "where the unambiguous language of documents upon which the claims are based contradict the complaint's allegations").

company.[117]  He argues that "[w]hen [he] agreed to receive an additional 0.1% of equity in the form of Incentive-1 Units, he had not seen the Award Agreement or any of its terms (including the clause purportedly regarding 90 days' written notice of resignation, and the overbroad 'Forfeiture Termination' provision that are at issue in this case)"[118] and that "all he had seen related to the Incentive-1 Units was the 'Initial Plan,' which did *not* contain a written resignation notice provision, and which solely contemplated the limited forfeiture of unvested Incentive-1 Units upon 'Termination of Service of a Participant.'"[119]  Moscowitz argues that he agreed to accept the Incentive-1 Units "[b]ased on the information available to him at the time."[120]

While Moscowitz's characterization of the balance between consideration and consequence as "draconian" is understandable,[121] three principles foreclose relief.

---

[117] D.I. 33 at 17; *see also id.* at 33–34 (contending dismissal "would be improper as there are numerous questions of fact and matters for discovery regarding the purpose of the Award Agreement [and] the parties' intent with respect to Paragraph 3.3 and the Award Agreement as a whole"); *id.* at 38 ("The Court should deny the motion and reject Theory's attempt to use the Award Agreement, which the Amended Complaint alleges to conflict with the Operating Agreement, to eliminate all of Moscowitz's equity, when its sole purpose was to round out Moscowitz's holdings, in a tax efficient manner, by granting him less than one percent of his equity.  No reasonable person, including initially Theory, would have expected that a rounding device could be used to deprive Moscowitz of all of his equity in the Company.").

[118] *Id.* at 17.

[119] *Id.* at 18 (emphasis in original).

[120] *Id.* at 17.

[121] *Id.* at 37, 49.

First, even if the parties intended for Moscowitz to receive the Incentive-1 Units and execute the Award Agreement only to correct a "math problem," where the contract language is clear and unambiguous, as it is here, the Court must ascertain the parties' intent by looking to the Agreements' plain terms.[122] Those terms do not reflect a purpose of curing a rounding error, and they do not reflect Moscowitz's concern that the 0.1% stake was inadequate consideration for the significant enumerated consequences. Instead, the Initial Plan predicted that the parties intended for Incentive-1 issuances to carry forfeiture and repurchase terms as determined in the Manager's sole discretion and enumerated in the Award Agreement.[123] The Award Agreement reflects the parties' intent that in exchange for the Incentive-1 Units, the Company could cash Moscowitz out if he and the Company parted ways, whether or not for Cause.[124]

Second, Moscowitz is a sophisticated party who was on notice of the Agreements' terms. Delaware law presumes that sophisticated parties like Moscowitz have read and are aware of the terms of the agreements they sign. "A party to a contract cannot silently accept its benefits, and then object to its perceived

---

[122] *See Nw. Nat'l Ins. Co.*, 672 A.2d at 43.

[123] *See* Initial Plan §§ 1.1, 1.2, 1.6, 2.2, 3.1, 3.2, 4.1, 4.2.

[124] *See* Award Agreement §§ 3.3, 3.4.

disadvantages, nor can a party's failure to read a contract justify its avoidance."[125] Moscowitz is no exception. He was aware of the consequences imposed by the Award Agreement, as foretold by the Operating Agreement and Initial Plan. The Initial Plan explicitly states that any Award is subject to the terms and restrictions set forth in the Award Agreement; that the Award Agreement "shall contain such additional terms, conditions or restrictions as the Manager shall determine;"[126] and that such restrictions may include "forfeiture of awards" "upon any Termination of Service of a Participant."[127] And the Initial Plan vested the Manager with sole discretion to "determine the effect of all matters and questions relating to Termination of Service, including when a Termination of Service is effective" and "the question of whether a Termination of Service resulted from a discharge for Cause."[128] The Initial Plan also put Moscowitz on notice that "the Incentive-1 Units shall be subject to such restrictions as the Manager shall determine in its sole discretion, including . . . repurchase rights," which "may, in the Manager's sole

---

[125] *Pellaton v. Bank of N.Y.*, 592 A.2d 473, 477 (Del. 1991) (alteration omitted) (quoting *Graham v. State Farm Mut. Auto. Ins. Co.*, 565 A.2d 908, 913 (Del. 1989)).

[126] Initial Plan § 3.1; *see also id.* §§ 3.1(b), 4.1, 4.2(a), 5.2.

[127] *Id.* § 4.1.

[128] *Id.* § 1.6; *see also id.* §§ 1.2, 1.5.

discretion, be contained in the applicable Award Agreement or in such other agreement as the Manager shall determine."[129]

Despite this notice and the plain terms of the Award Agreement, Moscowitz signed the Award Agreement in exchange for the Incentive-1 Units, no matter how few. By executing the LLC Agreement and approving the Initial Plan, Moscowitz attested to his understanding and agreement that any "issuance of the Incentive-1 Units shall be conditioned on [his] consent to such restrictions or [his] entering into such agreement or agreements."[130] Moscowitz did not bargain for more favorable terms or more valuable consideration. If he failed to read the Agreements he signed, "he alone is responsible for his omission."[131] And because he had no interest in or entitlement to the Incentive-1 Units until he executed the Award Agreement, he could have declined the Award and freed himself of the notice, forfeiture, and repurchase provisions he now complains of. But Moscowitz affirmatively elected to bind himself to the Award Agreement's terms by accepting 46,429 Incentive-1 Units from Theory in December 2013. Moscowitz is bound by the language of the

---

[129] *Id.* § 4.2(a).

[130] *Id.*

[131] *Pellaton*, 592 A.2d at 477 (quoting *Upton v. Tribilcock*, 91 U.S. 45, 50 (1875)).

unambiguous Agreements he signed, even if in retrospect he believes it to be a raw deal that did not play out as he expected.[132]

Finally, this Court will not weigh the sufficiency of the Award Agreement's consideration. "Even if the consideration exchanged is grossly unequal or of dubious value, the parties to a contract are free to make their bargain. Absent fraud or unconscionability, the adequacy of consideration is not a proper subject for judicial scrutiny."[133] Moscowitz does not plead fraud or seek rescission due to unconscionability. Moscowitz's belief that 46,429 Incentive-1 Units was insufficient consideration for the Company's rights under the Award Agreement is of no moment before this Court.

The Amended Complaint and the Agreements integral thereto fail to state a claim that the Award Agreement is unenforceable due to lack of consideration.[134] Moscowitz received 46,429 Incentive-1 Units in exchange for his services to Theory

---

[132] *See HC Cos., Inc.*, 2017 WL 6016573, at *5; *GRT, Inc.*, 2012 WL 2356489, at *7; *W. Willow-Bay Ct., LLC*, 2007 WL 3317551, at *9.

[133] *Acker*, 2004 WL 1230945, at *4 (alteration and internal quotation marks omitted) (quoting *Apfel v. Prudential-Bache Sec., Inc.*, 616 N.E.2d 1095, 1097 (N.Y.1993)).

[134] *See id.* (stating that "[a]n allegation that a party has received no consideration is a conclusion of law and is not entitled to deference" and finding that "the complaint pleads itself out of a viable claim that the [agreements] were without consideration"); *H-M Wexford LLC*, 832 A.2d at 139 (stating a claim is dismissed "where the unambiguous language of documents upon which the claims are based contradict the complaint's allegations").

43

and his consent to the restrictions set forth in the Award Agreement. Accordingly, Count I is dismissed.

### B. The Agreements Permit Theory To Repurchase A Participant's Equity Upon His Resignation, And To Do So At A Lower Price If He Resigned Without Notice.

Having concluded the Award Agreement is valid and supported by consideration, I turn to whether Moscowitz has stated claims under that Agreement. Count II seeks a declaratory judgment that Theory acted improperly under the Award Agreement by concluding Moscowitz's resignation was a Forfeiture Termination and accordingly electing to repurchase the Remaining Units. Count III claims that Theory breached the Award Agreement, and Count IV asserts Theory breached its implied covenant of good faith and fair dealing. Count V alleges conversion, and Count VI seeks the remedies of accounting and specific performance.

To the extent these claims depend on whether the Award Agreement permitted Theory to repurchase Moscowitz's units after his resignation, I dismiss them today. The Award Agreement is unambiguous; none of its terms are "reasonably susceptible of two or more interpretations or may have two or more different meanings."[135] The Court therefore ascertains the parties' intent with respect to the

---

[135] *Twin City Fire Ins. Co.*, 840 A.2d at 628 (quoting *Kaiser Alum. Corp.*, 681 A.2d at 395).

Moscowitz asserts that the Agreements are ambiguous, pointing to supposed "conflicts" between the Agreements "that cannot be resolved on a motion to dismiss." D.I. 33 at 35; *accord id.* at 36–37. He contends that because the terms of the Agreements with respect to certain issues are not identical, they are in conflict. First, he argues the Initial

Plan and Operating Agreement did not address resignation, and that "this concept first appears . . . in the Award Agreement." *Id.* at 36. Moscowitz is wrong: the Initial Plan states that the "Manager, in its absolute discretion, shall determine the effect of all matters and questions relating to Termination of Service," Initial Plan § 1.6, and that conditions regarding forfeiture of Awards upon Termination of Service, other than those stated in the Initial Plan, shall be determined at the Manager's discretion and detailed in the Award Agreement, *see id.* §§ 1.2, 1.6, 3.1(b), 4.1, 4.2.

He then argues that the Agreements address Forfeiture of Awards in conflicting ways. Recognizing for this argument that Section 4 of the Initial Plan contemplates forfeiture and repurchase, he states that "the later prepared Award Agreement contemplates broad forfeiture of not only just the Incentive-1 Units that it granted, but also 'Participant's vested Common Units and Participant's Preferred Units.'" D.I. 33 at 37 (quoting Award Agreement § 3.3(b)). But the Initial Plan provides for a forthcoming Award Agreement "contain[ing] such terms and conditions as the Manager shall determine," Initial Plan § 3.2, including for forfeiture and repurchase, *id.* §§ 4.1, 4.2. The Award Agreement is more specific than the Initial Plan by design: its terms are complementary, not conflicting.

Finally, Moscowitz contends the Award Agreement's parameters on a signatory's relationship with the Company conflict with the LLC Agreement. Without much explanation, Moscowitz concludes that the definitions of "Cause" provided in the Award Agreement conflict with the LLC Agreement, and asserts he is bound only by clauses in the LLC Agreement addressing a Founder's performance. *See* D.I. 33 at 36, 39. No such conflict exists.

As Founder, the LLC Agreement defines instances in which the Company could take action against Moscowitz for "Cause," including "a Founder's continuing failure to perform such Founder's assigned duties or responsibilities as an employee of the Company, consistent with the Founder's position with the Company, as directed or assigned by the Board . . . after written notice thereof." LLC Agreement § 3.1, "Cause" (a). This definition has limited import: it addresses a Founder's Common and Preferred Units in the event of a change of control, in his capacity as Founder. *See id.* § 7.2(c)(ii) (stating that "Upon any Change in Control of the Company . . . any remaining unvested Units owned by a Founder at such time shall vest upon such Founder's termination without Cause"). And "Cause" under the LLC Agreement includes

> a Founder's material breach of the terms of any agreement between the Founder and the Company (or any subsidiary of the Company), unless the Founder has cured such breach (to the extent that such breach is curable) within thirty (30) days following the Founder's receipt of written notice from the Board specifying with particularity the alleged breach.

*Id.* § 3.1, "Cause" (e). This definition contemplates that Moscowitz would enter into agreements with the Company that are separate and distinct from the LLC Agreement, including the Award Agreement. The consequences of breaching those agreements would

Award Agreement "by giving the language its ordinary and usual meaning."[136] Looking to the Award Agreement's plain language, I determine that Theory enjoys a repurchase right, whether or not Moscowitz's resignation is considered a Forfeiture Termination.

But to the extent these claims require consideration of the propriety and effect of the Resignation and Second Resignation Notices, the Motion is denied, as explained *infra*. Accordingly, for the reasons I will explain, Count IV is dismissed, and Counts II and III are dismissed in part; the Motion is denied with respect to the remaining portions of Counts II and III, as well as Counts V and VI.

---

redound to his role as a Founder. The LLC Agreement's definition of Cause in his role as Founder does not conflict with the definition in Section 3.3(a) in his role as a Participant. *Compare id.*, *and id.* § 3.3, "Cause" (a), *with* Award Agreement § 3.3(a). In fact, it is consistent with the Award Agreement's definition of Cause in Section 1.2(a), which as explained in Section II.B.1 *infra*, is separate and distinct from the Award Agreement's second definition of Cause in Section 3.3(a). *Compare* LLC Agreement § 3.1, "Cause" (e), *with* Award Agreement § 1.2(a).

Ultimately, the Agreements subject Moscowitz to three complementary definitions of Cause: (1) breach of the LLC Agreement's duties and responsibilities as Founder and Manager; (2) breach of the Award Agreement's obligations imposed in exchange for Incentine-1 Units; and (3) Termination of Service without 90 days' written notice. These definitions do not conflict.

[136] *Nw. Nat'l Ins. Co.*, 672 A.2d at 43.

### 1. Voluntary Resignation Without 90 Days' Written Notice Is A Termination Of Service For Cause Without An Opportunity To Cure.

Moscowitz resigned from Theory voluntarily. That resignation constituted a Termination of Service under the Award Agreement.[137] His Resignation Notice gave "notice of [his] *immediate* resignation as a Manager of the Company,"[138] rather than 90 days' written notice. Moscowitz claims Theory improperly deemed his resignation without notice to be a Termination of Service for Cause, and therefore a Forfeiture Termination resulting in repurchase of the Remaining Units under Section 3.3(b). He also contends Theory deprived him of a right to notice and opportunity to cure. Theory seeks dismissal on the grounds that it followed the Award Agreement in responding to Moscowitz's voluntary resignation. For purposes of construing the Award Agreement, I assume Moscowitz voluntarily resigned without 90 days' notice via the Resignation Notice; as explained below, this assumption is disputed and not resolved by this opinion.

Some consequences of Moscowitz's Termination of Service depend on whether it is considered "for Cause" or "other than for Cause."[139] Section 3.3(b)

---

[137] *See* Initial Plan § 1.6 (defining "Termination of Service" to include "resignation" of the "Service Provider's employment or other service with the Company . . . , but excluding any termination which includes simultaneous continuous service of the Participant with the Company"); Award Agreement § 1 (incorporating the Initial Plan's defined terms).

[138] Resignation Notice at 1 (emphasis added).

[139] *See* Award Agreement §§ 3.3(a), 3.3(b), 3.4.

addresses Termination for Cause.[140]  The Award Agreement defines "Cause" in two ways, depending on who is severing the relationship.  First, Section 1.2 sets forth six occurrences that justify Theory terminating a Participant's service for "Cause" "as determined in good faith by the Manager."[141]  Under Section 1.2(a), in the event the Manager perceives the Participant has committed a "material violation" of the Award Agreement, termination will be for Cause under Section 3.3(b).[142]  In view of the Manager's broad discretion to determine whether a material violation has occurred, Section 1.2(a) affords a Participant the right to notice of the perceived breach and an opportunity to cure.[143]

Second, Section 3.3(a) identifies Termination of Service for Cause by the Participant:  "in the event Participant voluntarily terminates Participant's service and fails to provide the Manager with written notice" during the 90-day Notice Period in advance of such Termination of Service (the "For Cause Provision").[144]  If the Participant resigns with 90 days' written notice, then the voluntary Termination of

---

[140] As explained below, this Section addresses both termination "by the Company" and voluntary termination by the Participant.  *See infra* Section II.B.3.

[141] Award Agreement § 1.2.

[142] *Id.* § 1.2(a); *see also id.* § 3.3(b).

[143] *See id.* § 1.2(a).

[144] *Id.* § 3.3(a).  The LLC Agreement also mandates that notice be written:  "Any notice or other communication required by this Agreement must be in writing.  Notices and other communications will be deemed to have been given when delivered by hand or dispatched . . . ."  LLC Agreement § 17.2.

Service is not for Cause. That Section does not include the right to notice and an opportunity to cure. The parties could have elected to include such a right, but explicitly did not. Rather, the parties agreed that a Participant voluntarily terminating service must provide 90 days' written notice for that termination to be deemed "other than for Cause."[145] If the Participant provides such notice, affording Theory an opportunity to off-ramp that person, then the Participant enjoys more favorable terms. But if the Participant resigns without 90 days' written notice, the Participant triggers a Termination of Service for Cause.[146]

Moscowitz argues that his Termination of Service could not be for Cause unless his conduct triggered an event listed in Section 1.2.[147] He also argues "Theory was required to evaluate Moscowitz's action in good faith and to give Moscowitz notice and an opportunity to cure" under Section 1.2(a).[148]

But Section 1.2's triggers for Cause are separate and distinct from, and in addition to, Section 3.3(a)'s trigger. While there are many grounds for which Theory

---

[145] Award Agreement § 3.3(b).

[146] I note that in view of the broad discretion vested in the Manager under the Initial Plan and Award Agreement with respect to Terminations of Service, it is possible that the Manager could afford a Participant who has voluntarily resigned without notice and therefore triggered Section 3.3(a)'s For Cause Provision notice and an opportunity to cure. That did not happen here: Theory's Manager held Moscowitz to the terms of the Award Agreement.

[147] *See* D.I. 33 at 41–42.

[148] *Id.* at 43 (internal quotation marks omitted) (citing Award Agreement § 1.2(a)).

could terminate a Participant for Cause, a Participant may also effectuate his own termination for Cause by resigning without sufficient notice. Moscowitz's termination would be for Cause if the Company decided he triggered the conditions in Section 1.2, or if he decided to resign without notice under Section 3.3(a)'s For Cause Provision. Moscowitz's voluntary resignation without written notice triggered not Section 1.2(a), but rather Section 3.3(a)'s For Cause Provision, which does not afford him notice or an opportunity to cure.

In an attempt to avail himself of Section 1.2(a)'s right to notice and opportunity to cure, Moscowitz argues that by electing to forego the Notice Period under Section 3.3(a), he was "violating the contract" and triggered Section 1.2(a).[149] For Moscowitz to prevail, the Court would have to transmogrify his voluntary resignation into a Manager-discerned violation of the Award Agreement. But as explained, Section 3.3 deems a Participant's voluntary resignation to be for Cause separately from the additional Cause triggers in Section 1.2.

In order for resignation without written notice to be a violation of the Award Agreement, the Court would also have to read into the For Cause Provision an obligation or duty requiring Moscowitz to provide 90 days' written notice before resigning.[150] The For Cause Provision contemplates the "event" that the Participant

---

[149] *Id.* at 44.

[150] *See GRT, Inc.*, 2012 WL 2356489, at *7 ("For a court to read into an agreement a contract term that was expressly considered and rejected by the parties in the course of

does not give written notice, but does not require such notice. It does not state that the Participant "shall provide" or "is required to provide" 90 days' written notice prior to a voluntary termination, nor does it command that the Participant give notice in any particular way. Rather, the For Cause Provision's only mandate is that voluntary Termination of Service without notice "*shall* be considered for 'Cause' for purposes of the Agreement."[151] It obliges the Manager to categorize a voluntary Termination of Service without notice as for Cause; it imposes no obligation on the Participant.

Under Section 3.3's plain terms, resignation without 90 days' written notice "shall be considered for Cause."[152] Moscowitz was not contractually obligated to give notice under Section 3.3(a); he did not breach the Award Agreement by resigning without notice; and he is not entitled to notice and an opportunity to cure his own resignation. If Moscowitz opted to resign effective immediately, he effectuated a Termination of Service for Cause, and he must endure the contractual consequences of his decision.

---

negotiations would be to create new contract rights, liabilities and duties to which the parties had not assented in contravention of that settled role." (internal quotation marks omitted) (quoting *Allied Cap. Corp.*, 910 A.2d at 1030)).

[151] Award Agreement § 3.3(a) (emphasis added).

[152] *Id.* (internal quotation marks omitted).

### 2. Termination Of Service For Cause Triggers Section 3.3(b)'s Forfeiture And Repurchase Provisions.

A Termination of Service for Cause under Section 3.3(a) results in a Forfeiture Termination under Section 3.3(b).[153] Theory repurchased Moscowitz's Remaining Units on the grounds that his resignation triggered a Forfeiture Termination and the cheaper repurchase price Theory enjoys as a result.[154] Moscowitz contends his resignation cannot constitute a Forfeiture Termination because the contractual provision describing Forfeiture Terminations addresses termination "by the Company," not voluntary resignations.[155] Theory asserts that Moscowitz misconstrues the contract. In considering the effect of a voluntary Termination of Service for Cause, I again put aside for now the issues associated with Moscowitz's "conditional" resignation and the effect of his Second Resignation Notice, and assume Moscowitz's immediate Resignation Notice, which did not give 90 days' written notice, is effective.

When determining whether a Participant's voluntary termination can constitute a Forfeiture Termination under Section 3.3(b), I must construe the Award Agreement "as a whole,"[156] "giv[ing] effect to all of the terms of the instrument and

---

[153] *See id.* §§ 3.3(a), 3.3(b).

[154] *See id.* § 3.3(b); Am. Compl. ¶ 27.

[155] *See* D.I. 33 at 41–42.

[156] *See Nw. Nat'l Ins. Co.*, 672 A.2d at 43.

read[ing] it in a way that, if possible, reconciles all of its provisions," "as opposed to one that creates an inconsistency or surplusage."[157] While Section 3.3 presents some obstacles to a fully reconciled reading, I conclude reading Forfeiture Terminations to exclude voluntary Terminations of Service for Cause would do untoward violence to the contract.

Section 3.3 is titled "Effect of Termination of Service on Interests."[158] Section 3.3(a), entitled "Termination other than for Cause," begins by explaining what happens to a Participant's Interests if the Company terminates the Participant's service "for any reason other than Cause."[159] It goes on to address voluntary Termination of Service by the Participant and, in the For Cause Provision, identifies the circumstances under which a Participant subjects himself to the consequences in Section 3.3(b).[160] Thus, while Section 3.3(a) begins with the phrase "[i]n the event of Participant's Termination of Service *by the Company*," that language refers to Company terminations other than for Cause, but does not apply to its subsequent discussion of voluntary terminations or the For Cause Provision.[161]

---

[157] *GRT, Inc.*, 2012 WL 2356489, at *4.

[158] Award Agreement § 3.3.

[159] *Id.* § 3.3(a).

[160] *Id.*

[161] *Id.* (emphasis added).

Section 3.3(b), titled "Termination *by the Company* for Cause," defines a Forfeiture Termination as "Participant's Termination of service *by the Company* and/or its subsidiaries for Cause."[162] In a vacuum, the phrase "by the Company" in the definition of Forfeiture Termination would exclude voluntary terminations. But limiting Forfeiture Terminations to Terminations of Service "by the Company" would effectively read out the For Cause Provision and render it surplusage. Section 3.3(a) goes to the trouble of identifying voluntary terminations "for Cause;" Section 3.3(b) is the only provision that can give meaning to that identification. Section 3.3(b) must be interpreted to give effect to the For Cause Provision. While this interpretation reads out the phrase "by the Company" from the definition of a Forfeiture Termination, this does less violence to the contract than reading out the For Cause Provision. I construe Section 3.3 to first categorize voluntary resignations without sufficient notice as for Cause, and then to categorize all terminations for Cause, either by the Company or by the Participant, as Forfeiture Terminations.

Assuming Moscowitz's Resignation Notice effected his immediate resignation, his Remaining Units are subject to Section 3.3(b)'s consequences: the Company's option to repurchase them at a predetermined cost per unit.[163] Theory

---

[162] *Id.* § 3.3(b) (emphasis added).

[163] *Id.* § 3.3(b)(i)–(iii). The parties do not dispute that Moscowitz's Remaining Units vested or the timeliness of Theory's Repurchase Letter.

sought to exercise that option by delivering its Repurchase Letter on January 17, 2017.[164]  Again assuming Moscowitz resigned without 90 days' written notice, Theory's Repurchase Letter was authorized by the Award Agreement's plain terms.

Beyond the contractual language justifying it, Moscowitz raises two concerns regarding the Repurchase Letter.  First, he contends that Theory somehow acted wrongfully by exercising its repurchase right after Moscowitz accepted the Tender Offer:[165]  "Had Theory believed the position that it has taken now in this litigation, it should have refused to buy Moscowitz's shares and [] advised him that it would be purchasing them for $0.10 per share (or $144,948.90).  Instead, Theory performed on the tender offer and paid Moscowitz $2,388,757.87 for his equity."[166]  He argues that under Theory's reading of the Award Agreement, Theory should have "require[d] the forfeiture of *all* of Moscowitz's Theory Units," rather than "permitt[ing] Moscowitz to participate in the tender offer."[167]

Moscowitz misreads the plain language of Section 3.3(b), which provides that "the Company shall have the *option*" within a one-year period to repurchase his units

---

[164] Am. Compl. ¶ 27.

[165] *See id.* ¶¶ 27, 58; D.I. 33 at 27, 29.  Moscowitz primarily uses the Tender Offer as support for his conditional resignation.  As discussed below, I do not address this issue today, as the Motion is denied to that effect.

[166] D.I. 33 at 27.

[167] *Id.* at 48 (emphasis in original).

at fixed prices.[168] An "option" is "[a] contract by which a property owner agrees with another party that the latter *may* buy the property at a fixed price within a specified time; the right or privilege to buy property *at the election of the purchaser*" or "[t]he right (*but not the obligation*) to buy or sell a given quantity of securities, commodities, or other assets at a fixed price within a specified time."[169] Theory could exercise its repurchase option at any time before December 1, 2017, regardless of whether it purchased some of Moscowitz's units in the Tender Offer. The Company had the "right to choose" when and if it purchased all or some of the Remaining Units as circumscribed by the Award Agreement.[170] Theory's business decision to buy some of Moscowitz's units in the Tender Offer does not make the Award Agreement inapplicable to his Remaining Units.[171]

---

[168] Award Agreement § 3.3(b) (emphasis added).

[169] *Option*, *Black's Law Dictionary* (11th ed. 2019) (emphasis added); *accord Option*, Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/option (last visited October 27, 2020) (defining "option" as "the power or right to choose" or "freedom of choice," "a privilege of demanding fulfillment of a contract on any day within a specified time," and "a contract conveying a right to buy or sell designated securities, commodities, or property interest at a specified price during a stipulated period").

[170] *Option*, Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/option (last visited October 27, 2020).

[171] Moscowitz does not assert estoppel, waiver, or any other doctrinal grounds for modifying the terms of the Award Agreement based on the parties' participation in the Tender Offer.

Next, Moscowitz argues that Theory breached Section 3.3(b)(iii)'s pricing structure by stating in its Repurchase Letter that it was acquiring the Remaining Units at $0.10 per unit.[172] Sections 3.3(b)(i)–(iii) fix the prices for Theory's repurchase option in the event of a Forfeiture Termination. Those prices vary based on the type of unit Theory elects to repurchase.[173] Section 3.3(b)(i) allows Theory to purchase vested Incentive-1 Units at $0.10 per unit.[174] Section 3.3(b)(ii) allows Theory to purchase vested Common Units at "the *lesser* of (1) the Fair Market Value of such Common Units and (2) the greater of (A) the original cost . . . paid by the Participant in respect of such Common Units and (B) $0.10 per Common Unit."[175]

Moscowitz alleges that the Repurchase Letter asserted a $0.10 repurchase price for both Common and Incentive-1 Units.[176] But he contends this price was a breach for the first time in briefing, not in his Amended Complaint. "Briefs relating to a motion to dismiss are not part of the record and any attempt contained within such documents to plead new facts or expand those contained in the complaint will

---

[172] D.I. 33 at 45–46.

[173] *Compare* Award Agreement § 3.3(b)(i), *with id.* § 3.3(b)(ii), *and id.* § 3.3(b)(iii).

[174] *Id.* § 3.3(b)(i).

[175] *Id.* § 3.3(b)(ii) (emphasis added).

[176] Am. Compl. ¶ 28 ("Theory also claimed that a Forfeiture Termination allowed Theory to repurchase Moscowitz's Incentive-1 Units and Common Units—which Theory counted as 2,789,797 Common Units and 46,429 Incentive-1 Units—at $0.10 per Unit.").

not be considered."[177]  And a plaintiff "cannot defeat an argument raised in a motion

to dismiss by proffering an after-the fact theory for this first time in his answering

brief."[178]  I need not consider this new allegation on the Motion.[179]

Under the plain terms of the Award Agreement, resigning without 90 days'

written notice triggers a Forfeiture Termination under Section 3.3(b).  A Forfeiture

---

[177] *Orman v. Cullman*, 794 A.2d 5, 28 n.59 (Del. Ch. 2002).

[178] *In re Saba Software, Inc. S'holder Litig.*, 2017 WL 1201108, at *23 (Del. Ch. Mar. 31, 2017) (citing *Dolphin Ltd. P'ship I, L.P. v. Gupta*, 2007 WL 315864, at *1 (Del. Ch. Jan. 22, 2007) (refusing to consider an allegation not found in the complaint when addressing plaintiff's response to a motion to dismiss), and *OLL Ventures, Inc. v. Woodland Mills Assocs., L.P.*, 2001 WL 312452, at *1–2 (Del. Ch. Mar. 8, 2001) (same)).

[179] *See Gerber v. EPE Hldgs., LLC*, 2013 WL 209658, at *10 (Del. Ch. Jan. 18, 2013) (concluding where the plaintiff made an argument for the first time in briefing that "the Court . . . need to consider only the claims fairly asserted in the [complaint]," but choosing to "briefly address" plaintiff's arguments anyway).  In reply, Theory explains that even if the Court were to consider this allegation, Moscowitz's claim would fail because Theory reached the $0.10 per unit repurchase price for the Common Units based on the formula set forth in Section 3.3(b)(ii).  *See* D.I. 35 at 22–24.  Moscowitz alleges that his capital contribution to Theory was $400,000, and that in return he received 3,829,286 Common Units and 400,000 Preferred Units.  Am. Compl. ¶¶ 9, 12; *see also* LLC Agreement sched. A.  If no Preferred Units issued at all, dividing his total contribution by the total number of Common Units issued indicates Moscowitz would have paid approximately $0.1044581156 per Common Unit.  *See* Am. Compl. ¶¶ 9, 12.  Because Moscowitz also purchased 400,000 Preferred Units with his initial capital contribution, it is reasonable to infer that the purchase price paid per Common Unit was less than $0.10 per unit.  And Moscowitz concedes that the Fair Market Value of his Common Units is greater than the exercise price of Theory's option under the Award Agreement.  *See* D.I. 33 at 30 ("Moscowitz went from being a co-founder of Theory with an interest worth at least $1.648 per share (using the tender offer price) (or $4,674,100.45) to just $0.10 per share (or $283,622.60).  The disparity in those figures is much greater today given Theory's increased value.").  Based on that explanation, Theory's conclusion that it reached the $0.10 price stated in the Repurchase Letter based on Section 3.3(b)(ii)'s formula is reasonable.  (Nothing in the Award Agreement required Theory to explain its reasoning behind the repurchase price.)  At bottom, Moscowitz failed to allege his belief that Theory used the wrong original price or fair market value in his Amended Complaint.

58

Termination gives Theory the option, or right, to repurchase some or all of the Participant's vested units at fixed prices for one year following the resignation. Moscowitz fails to state a claim for breach of the Award Agreement.

### 3. Even If Moscowitz's Resignation Is Not Considered A Forfeiture Termination, Theory Has A Call Option Under Section 3.4.

Moscowitz spilled a great deal of ink trying to avoid labeling his resignation as a Forfeiture Termination, claiming Theory has no right, at any price, to repurchase his Remaining Units. But even if Moscowitz resigned with 90 days' written notice (as he purports to have done in his Second Resignation Notice), his resignation would still trigger a repurchase right—just at a better price for him. Any dispute about the fate of Moscowitz's Remaining Units is limited to the price at which they were repurchased.

Section 3.4 addresses the "Company's Repurchase Right" "[i]n the event of Participant's Termination of Service *for any reason other than a Forfeiture Termination*."[180] A voluntary Termination of Service that is not a Forfeiture Termination initiates the Company's Repurchase Right, and the Company "in its sole discretion, may exercise a right to repurchase for Fair Market Value some or all of Participant's vested" units.[181] This "Call Right" allows Theory to repurchase such

---

[180] Award Agreement § 3.4 (emphasis added).

[181] *Id.*

59

units for one year following the Participant's Termination of Service at Fair Market Value.[182] If Theory chooses to exercise its Call Right, then the repurchased units "shall be cancelled by the Company without any further action of Participant, and Participant shall have no further right or interest in or with respect to such Interests."[183]

Thus, even if Moscowitz is correct that his was not a Forfeiture Termination, Theory had the right to purchase some or all of the Remaining Units for one year following his resignation.[184] The only distinction in that case would be the repurchase price. Rather than paying $0.10 per unit, Section 3.4 would compel Theory to pay Moscowitz Fair Market Value.

### 4. Counts II And III Are Dismissed In Part.

As explained, Theory had the right to repurchase all of the Remaining Units under either Section 3.3(b) or Section 3.4 of the Award Agreement. Thus, to the extent Count II seeks a declaratory judgment that Theory was not contractually entitled to repurchase those units, Count II is dismissed in part.

---

[182] *Id.*

[183] *Id.*

[184] This would also be the case assuming Moscowitz was correct that his was not a Termination of Service for Cause "by the Company" that triggered a Forfeiture Termination under Section 3.3(b). And it is the case regardless of which of Moscowitz's resignation notices was effective.

60

Similarly, Count III is dismissed in part.[185]  Count III alleges Theory breached the Award Agreement by

> purporting to redeem Moscowitz's membership Units; failing to give notice to Moscowitz of any purported breach of the Award Agreement; failing to provide any opportunity to cure such breach to Moscowitz; improperly construing the Award Agreement such that Moscowitz's [Resignation Notice] gives rise to a Forfeiture Termination; improperly terminating Moscowitz's membership interest in Theory; and converting, alienating, or otherwise dealing with Moscowitz's Units and/or membership interest without Moscowitz's consent.[186]

Assuming Moscowitz resigned via the Resignation Notice, Theory had the express right under Section 3.3 to redeem the Remaining Units.  Even if Moscowitz had given adequate written notice of his resignation, Theory could still repurchase the Remaining Units, and the dispute would be limited to the price.  Theory had the right to redeem Moscowitz's units and terminate his membership interest.

I have also concluded that the Award Agreement did not impose on Moscowitz an obligation to give 90 days' written notice of his resignation that he breached, nor did it give Moscowitz the right to notice and an opportunity to cure. Count III is dismissed in part.

---

[185] *See Sparton Corp. v. O'Neil*, 2017 WL 3421076, at *5 (Del. Ch. Aug. 9, 2017) ("In order to allege a breach of contract, a plaintiff must show the existence of a contract, a breach of the contractual obligations, and damages to the plaintiff as a result of the breach.").

[186] Am. Compl. ¶ 51.

However, the Motion is denied with respect to Count II's request that the Court determine the validity and effect of the Resignation and Second Resignation Notices and Count III's contention that Theory improperly construed the Resignation Notice for the reasons explained in Section II.C below.

### 5. Count IV Fails To State A Claim For Breach Of The Implied Covenant Of Good Faith And Fair Dealing.

Count IV is also dismissed because Moscowitz has failed to state a claim for breach of the implied covenant of good faith and fair dealing. "The implied covenant of good faith and fair dealing inheres in every contract."[187] It "involves a cautious enterprise, inferring contractual terms to handle developments or contractual gaps that the asserting party pleads neither party anticipated."[188] The doctrine "cannot be used to circumvent the parties' bargain, or to create a free-floating duty unattached to the underlying legal documents."[189]

---

[187] *Kuroda v. SPJS Hldgs., L.L.C.*, 971 A.2d 872, 888 (Del. Ch. 2009).

[188] *Nemec*, 991 A.2d at 1125 (internal quotation marks omitted) (quoting *Dunlap v. State Farm Fire & Cas. Co.*, 878 A.2d 434, 445 (Del. 2005)); *see also Allen v. El Paso Pipeline GP, Co., L.L.C.*, 113 A.3d 167, 182 (Del. Ch. 2014) (referring to the implied covenant as "the doctrine by which Delaware law cautiously supplies terms to fill gaps in the express provisions of a specific agreement").

[189] *Lonergan v. EPE Hldgs., LLC*, 5 A.3d 1008, 1017 (Del. Ch. 2010) (quoting *Dunlap*, 878 A.2d at 441).

We will only imply contract terms when the party asserting the implied covenant proves that the other party has acted arbitrarily or unreasonably, thereby frustrating the fruits of the bargain that the asserting party reasonably expected. When conducting this analysis, we must assess the parties' reasonable expectations at the time of contracting and not rewrite the contract to appease a party who later wishes to rewrite a contract he now believes to have been a bad deal. Parties have a right to enter into good and bad contracts, the law enforces both.[190]

Determining whether the implied covenant applies turns on the language of the contract itself.[191] A claim for breach of the implied covenant cannot be based "on conduct authorized by the terms of the agreement."[192] The Court relies on the implied covenant "only in that narrow band of cases where the contract as a whole speaks sufficiently to suggest an obligation and point to a result, but does not speak directly enough to provide an explicit answer."[193] "It must be clear from what was expressly agreed upon that the parties who negotiated the express terms of the contract would have agreed to proscribe the act later complained of . . . had they thought to negotiate with respect to that matter."[194]

---

[190] *Nemec*, 991 A.2d at 1126 (footnotes omitted).

[191] *Allen*, 113 A.3d at 183.

[192] *Dunlap*, 878 A.2d at 441; *see also Nemec*, 991 A.2d at 1127 (stating the implied covenant cannot be used to "contradict[] a clear exercise of an express contractual right").

[193] *Lonergan*, 5 A.3d at 1018 (quoting *Airborne Health, Inc. v. Squid Soap, LP*, 984 A.2d 126, 146 (Del. Ch. 2009)).

[194] *Id.* (omission in original) (internal quotation marks omitted) (quoting *Katz v. Oak Indus. Inc.*, 508 A.2d 873, 880 (Del. Ch. 1986)).

Moscowitz looks to the implied covenant to nullify his immediate resignation via the Resignation Notice, or to give him the opportunity to revisit or cure it. The Amended Complaint alleges that "[t]o the extent it does not expressly address it, the Award Agreement would have implied the opportunity to cure any defective resignation—especially where Moscowitz clearly attempted to resign without forfeiting his Units—before a Forfeiture Termination could occur."[195] According to Moscowitz, "[t]he Award Agreement does not expressly address how any alleged deficiencies in a notice of resignation may be addressed,"[196] but does "include a notice and opportunity to cure provision that suggests the parties did not intend to allow any technical deficit in a notice of resignation to result in the unjust result of the loss . . . all equity units."[197] Moscowitz theorizes that "[h]ad the parties considered it, they would not have agreed that Moscowitz's attempted, but technical non-compliance, with the notice period set forth in Award Agreement, could result in the forfeiture of *all* of Moscowitz's Theory Units."[198]

Count IV is the type of implied covenant claim this Court routinely rejects: the precise conduct Moscowitz complains of is "authorized by the terms of the

---

[195] Am. Compl. ¶ 59.

[196] *Id.* ¶ 56.

[197] *Id.* ¶ 57.

[198] *Id.* ¶ 59 (emphasis in original) (footnote omitted).

agreement," so there is no gap for the implied covenant to fill.[199] Contrary to his claim, the parties addressed Moscowitz's perceived "deficiencies" in his resignation, namely failure to provide 90 days' written notice. Section 3.3(a) strictly mandates that failure to provide such notice results in a Termination of Service for Cause and associated forfeiture and repurchase consequences. Likewise, as explained above, Section 3.3 intentionally does not provide Moscowitz with the right to notice and an opportunity to cure. And to the extent Moscowitz contends that the parties would have agreed that verbal notice or his attempt to resign in compliance with Section 3.3(a) would avoid loss of all Remaining Units, Section 3.4 squarely addresses that concern: any resignation permits repurchase, just at a higher price.

The parties set firm parameters for voluntary Terminations of Service, and clear consequences for resigning without sufficient notice. The parties could have bargained for more lenient circumstances for voluntary Terminations of Service, as Moscowitz suggests, but opted not to. The Court declines to provide Moscowitz with contractual protections he failed to secure for himself at the bargaining table.[200] Count IV is dismissed.

---

[199] *Dunlap*, 878 A.2d at 441.

[200] *See Winshall v. Viacom Int'l, Inc.*, 55 A.3d 629, 636–37 (Del. Ch. 2011) ("[T]he implied covenant of good faith and fair dealing should not be applied to give plaintiffs contractual protections that they failed to secure for themselves at the bargaining table. In other words, the implied covenant is not a license to rewrite contractual language just because the plaintiff failed to negotiate for protections that, in hindsight, would have made the contract a better deal. Rather, a party may only invoke the protections of the covenant when it is

**C. The Motion Is Denied In Part As To Counts II, III, V, And VI Regarding The Effect Of Moscowitz's Resignation Efforts.**

Although I have determined the Award Agreement is binding on Moscowitz and Theory has the right to repurchase its preferred amount of Moscowitz's Remaining Units, that does not end the inquiry. Each of the remaining counts depends in part on the effect and validity of the Resignation Notice, Board Notice, Repurchase Letter, Revocation Letter, and Second Resignation Notice. Moscowitz contends the Resignation Notice constituted a conditional resignation; that Theory accepted his resignation; that after Theory labeled his resignation a Forfeiture Termination, he revoked that resignation via the Revocation Letter; and that his resignation was effective, but still conditional, under the Second Resignation Notice.

Theory moved to dismiss Moscowitz's claims based on his resignation narrative by seeking to hold him to the Resignation Notice and contending it was not conditional. Theory points out the Award Agreement does not contemplate a conditional resignation, could not be modified except by a bilateral instrument in writing, and grants Theory's Manager the "absolute discretion" to "determine the effect of all matters and questions relating to Termination of Service, including when

---

clear from the underlying contract that the contracting parties would have agreed to proscribe the act later complained of had they thought to negotiate with respect to that matter." (alteration, footnotes, and internal quotation marks omitted)), *aff'd*, 76 A.3d 808 (Del. 2013).

66

a Termination of Service is effective."[201]   Theory also needles Moscowitz's purported conditions, contending the events that would nullify his resignation have not come to pass.

Theory's Motion falls short of demonstrating, as it must, that Moscowitz cannot "recover under any reasonably conceivable set of circumstances."[202]   In simply comparing the Resignation Notice to the Award Agreement, Theory fails to consider the subsequent dance between the parties.  Moscowitz sought to make his resignation conditional, as the Resignation Notice states,

> If for any reason, whatsoever, a court of competent jurisdiction determines that the foregoing resignation shall result in the loss, forfeiture, diminution or waiver of the undersigned's rights and/or entitlements as a Member or owner of a membership interest in the Company, the foregoing resignation shall be deemed void, _ab initio_, and of no force or effect.[203]

The Board Notice in response to the Resignation Notice states that "[t]he Company hereby reserves and does not waive any rights it has with respect to the foregoing, including with respect to any rights it has under the [LLC] Agreement, the Initial Plan and [Award Agreement]."[204]   After Theory indicated its intent to repurchase Moscowitz's Remaining Units under the Forfeiture Termination framework,

---

[201] Initial Plan § 1.6.

[202] _Cent. Mortg. Co._, 27 A.3d at 535.

[203] Resignation Notice at 1 (emphasis in original).

[204] Board Notice at 1.

67

Moscowitz purported to retract his resignation in the Revocation Letter; he then resubmitted his resignation, purporting to provide 90 days' written notice under Section 3.3(a), via the Second Resignation Notice. Theory's Motion does not consider or accommodate these additional steps.

Theory contends Moscowitz's "conditional resignation" is foreclosed by the LLC Agreement, but that Agreement is silent on Manager resignation. Nothing therein prohibits Moscowitz from resigning subject to certain conditions. The Delaware Limited Liability Company Act provides that "[a] manager may resign as a manager of a limited liability company at the time or upon the happening of events specified in a limited liability company agreement and in accordance with the limited liability company agreement."[205] This Court has recognized conditional resignations.[206] Theory has not foreclosed Moscowitz's ability to submit a conditional resignation.

The next question is whether Moscowitz's purported conditions could be effective. Again, the LLC Agreement does not address Manager resignation. Theory, as an LLC, deserves this Court's commitment "to give the maximum effect

---

[205] 6 *Del. C.* § 18-602.

[206] *See, e.g.*, *Bouchard v. Braidy Indus., Inc.*, 2020 WL 2036601, at *15 (Del. Ch. Apr. 28, 2020) (assessing a corporate director's conditional resignation in view of a voting agreement); *Martin v. Med-Dev Corp.*, 2015 WL 6472597, at *10 (Del. Ch. Oct. 27, 2015) (assessing a conditional resignation in the corporate context under 8 *Del. C.* § 141); *In re Peierls Family Inter Vivos Trs.*, 59 A.3d 471, 476 (Del. Ch. 2012) (assessing a conditional resignation in the trust context), *aff'd*, 77 A.3d 249 (Del. 2013).

to the principle of freedom of contract,"[207] including the provisions regarding Termination of Service in the Initial Plan and Award Agreement. But Theory is also a manager-managed LLC with a board of managers, such that it should expect this Court to draw on analogies to corporate law.[208] The parties did not brief whether this Court should consider Manager resignation under contract principles, or principles of corporate law.[209]

---

[207] 6 *Del. C.* § 18-1101(b).

[208] *Obeid v. Hogan*, 2016 WL 3356851, at *6 (Del. Ch. June 10, 2016) ("Using the contractual freedom that the LLC Act bestows, the drafters of an LLC agreement can create an LLC with bespoke governance features or design an LLC that mimics the governance features of another familiar type of entity. The choices that the drafters make have consequences. . . . If the drafters have opted for a manager-managed entity, created a board of directors, and adopted other corporate features, then the parties to the agreement should expect a court to draw on analogies to corporate law. Depending on the terms of the agreement, analogies to other legal relationships may also be informative. . . . It is important not to embrace analogies to other entities or legal structures too broadly or without close analysis, because the flexibility inherent in the limited liability company form complicates the task of fixing such labels or making such comparisons. (citations, footnotes, and internal quotation marks omitted)); *see* LLC Agreement § 11.1(a) ("The business of the Company shall be managed by a Board of Managers . . . . A Member, in its capacity as such, shall not participate in the day-to-day operation of the business affairs of the Company."); *id.* § 11.2 (granting the Board "the general powers and duties of management typically vested in the board of directors of a corporation" subject to other provisions of the LLC Agreement).

[209] *See Llamas v. Titus*, 2019 WL 2505374, at *17-18 (Del. Ch. June 18, 2019) (contemplating corporate parallels that logically apply to removal of a manager from a manager-managed LLC); *see also*, *e.g.*, *Martin*, 2015 WL 6472597, at *11 (holding that general contract principles did not apply when assessing enforceability of a corporate director's conditional resignation because "resignations pursuant to 8 *Del. C.* § 141(b) are creatures of statute, not contract" and therefore "director resignations a[re] statutory, rather than contractual, instruments"); *id.* at *14 (considering a director's conditional resignation in unilateral terms); *compare* 6 *Del. C.* § 18-1101(b) (stating that "[i]t is the policy of this chapter to give the maximum effect to the principle of freedom of contract"), *and id.* § 18-602 ("A limited liability company agreement may provide that a manager shall not have

Moscowitz's conditions do not appear to alter the foundational terms of the LLC Agreement, but rather terms in subsequent contracts between himself and Theory, namely the Initial Plan and Award Agreement. Considering those conditions under general contract principles, in order for his conditions to be binding, there must be a meeting of the minds as to that point.[210] In making such a determination, Delaware "has adopted the mirror-image rule."[211]

---

the right to resign as a manager of a limited liability company. Notwithstanding that a limited liability company agreement provides that a manager does not have the right to resign as a manager of a limited liability company, a manager may resign as a manager of a limited liability company at any time by giving written notice to the members and other managers. If the resignation of a manager violates a limited liability company agreement, in addition to any remedies otherwise available under applicable law, a limited liability company may recover from the resigning manager damages for breach of the limited liability company agreement and offset the damages against the amount otherwise distributable to the resigning manager."), *with* 8 *Del. C.* § 141(b) ("Each director shall hold office until such director's successor is elected and qualified or until such director's earlier resignation or removal. Any director may resign at any time upon notice given in writing or by electronic transmission to the corporation. A resignation is effective when the resignation is delivered unless the resignation specifies a later effective date or an effective date determined upon the happening of an event or events. A resignation which is conditioned upon the director failing to receive a specified vote for reelection as a director may provide that it is irrevocable.").

[210] *Cf. Martin*, 2015 WL 6472597, at *11 (suggesting that "want of essential elements of a contract, including the intent to be bound" would be relevant if the conditional resignation was not handled under 8 *Del. C.* § 141(b) and was instead governed by "general contract principles").

[211] *Ramone v. Lang*, 2006 WL 4762877, at *10 (Del. Ch. Apr. 3, 2006) (citing *Friel v. Jones*, 206 A.2d 232, 233–34 (Del. Ch. 1964), *aff'd*, 212 A.2d 609 (Del. 1965), and also citing *PAMI-LEMB I Inc. v. EMB-NHC, L.L.C.*, 857 A.2d 998, 1015 (Del. Ch. 2004)).

> In order to constitute an "acceptance," a response to an offer must be on identical terms as the offer and must be unconditional. A response to an offer that is not on the terms set forth by the offeror constitutes a rejection of the original offer and a counteroffer. The words and conduct of the response are to be interpreted in light of all the circumstances.[212]

The parties did not thoroughly brief how the Resignation Notice conditions fared under this framework, and Theory has not shown they could not have survived.

And the dance between the parties may be even more elaborate. Moscowitz's conditions seem to line out parts of the Award Agreement, including Sections 3.3 and 3.4, in connection with the resignation. It reads as a statement of Moscowitz's intention not to abide by the Award Agreement's plain terms, which may be not a condition, but a repudiation. "Under Delaware law, repudiation is an outright refusal by a party to perform a contract or its conditions entitling the other contracting party to treat the contract as rescinded. A statement not to perform unless terms different from the original contract are met also constitutes a repudiation."[213] "A party repudiates a contract when it takes an action that constitutes a significant and

---

[212] *PAMI-LEMB I Inc.*, 857 A.2d at 1015 (footnotes omitted).

[213] *CitiSteel USA, Inc. v. Connell Ltd. P'ship*, 758 A.2d 928, 931 (Del. 2000) (internal quotation marks and footnotes omitted) (quoting *Sheehan v. Hepburn*, 138 A.2d 810, 812 (Del. Ch. 1958)).

substantial alteration of both the present and the reasonably anticipated future relations created by the agreement."[214]

Considering the Resignation Notice as a repudiation may give some doctrinal context to the Board Notice and Revocation Letter. Once the repudiation is final, the non-repudiating party "may respond by (i) electing to treat the contract as terminated by breach, (ii) by lobbying the repudiating party to perform, or (iii) by ignoring the repudiation."[215] Depending on how the non-repudiating party responds, the would-be repudiator may retract his repudiation:

> A repudiation is, of course, the reverse of positive and clear where the promisor before the time of performance retracts the repudiation and announces himself prepared to perform his promise. Thus, when effective, a retraction has the effect of nullifying a repudiation and placing the matter in its original position. There are, however, circumstances that will remove the possibility of retraction. This limitation on the power to retract a repudiation reflects a concern for the awkward situation in which ambiguity concerning performance may place the promisee. . . . Indeed, the law's concern with the uncertainty faced by a promisee to whom a repudiation has been made is such that it, in effect, gives such a promisee the election to withdraw the promisor's power to retract his repudiation simply by notifying the promisor that he considers the repudiation to be final.[216]

---

[214] *PAMI-LEMB I Inc.*, 857 A.2d at 1014 (alteration and internal quotation marks omitted) (quoting *Bali v. Christiana Care Health Servs.*, 1998 WL 685380, at *1 (Del. Ch. Sept. 22, 1998)).

[215] *Henkel Corp. v. Innovative Brands Hldgs., LLC*, 2013 WL 396245, at *7 (Del. Ch. Jan. 31, 2013); *accord Mumford v. Long*, 1986 WL 2249, at *3 (Del. Ch. Feb. 21, 1986) ("Where a contracting party repudiates a contract, the non-breaching party is entitled to treat the contract as terminated, *i.e.*, as being at an end.").

[216] *Carteret Bancorp, Inc. v. Home Gp., Inc.*, 1988 WL 3010, at *6 (Del. Ch. Jan. 13, 1988).

Thus, "[o]nce the promisee relies on the repudiation—e.g., by filing suit for damages or by engaging in a substitute transaction—or notifies the promisor it regards the repudiation as final, effective retraction is no longer possible."[217]

The doctrines of offer and acceptance, and of repudiation and retraction, mean that the analysis of Moscowitz's Resignation Notice is more complicated than simply comparing it to the Award Agreement as Theory asserts. It remains to be seen how these doctrines may apply in this case, considering in particular whether there was a meeting of the minds on Moscowitz's offered conditions; whether the conditions imposed in both the Resignation and Second Resignation Notices constituted a repudiation of the Award Agreement; whether Moscowitz was able to retract any repudiation after receiving the Board Notice; whether in view of the foregoing, the Second Resignation Notice has any effect; and whether the Second Resignation Notice's conditions were effective. This inquiry is also informed by today's determinations that Moscowitz was not entitled to notice and an opportunity to cure and of the Manager's broad discretion under the Initial Plan and Award Agreement to determine all matters with respect to Terminations of Service.

These open issues preclude me from dismissing Count II's request for a declaratory judgment that the Resignation Notice is of no force and effect and that

---

[217] *Henkel Corp.*, 2013 WL 396245, at *7 (quoting *W. Willow-Bay Ct., LLC v. Robino-Bay Ct. Plaza, LLC*, 2009 WL 458779, at *5 (Del. Ch. Feb. 23, 2009)).

Moscowitz's Second Resignation Notice validly effected his resignation, and Count III's claim that Theory breached the Award Agreement by processing a Forfeiture Termination based on a Resignation Notice stripped of its conditions. Counts V and VI remain viable as well, to accommodate the possibility that Moscowitz resigned in a manner that is not properly a Forfeiture Termination.

## III. CONCLUSION

The Award Agreement is binding on Moscowitz, supported by valid determination, would provide for a Forfeiture Termination if Moscowitz in fact resigned without giving 90 days' notice, and does not provide Moscowitz with the rights of notice and an opportunity to cure. The Award Agreement gave the Company the option to repurchase Moscowitz's shares, either because his resignation was a Forfeiture Termination or pursuant to the Call Right. But the terms by which Moscowitz actually resigned remain unadjudicated.

The Motion is GRANTED with respect to Counts I and IV. Counts II and III are GRANTED IN PART. The Motion is DENIED with respect to the remaining portions of Counts II and III, as well as Counts V and VI. The parties shall submit an implementing order within twenty days of this decision.